Smart AZIKEN, Petitioner

v.

## DISTRICT OF COLUMBIA ALCO-HOLIC BEVERAGE CONTROL BOARD, Respondent.

No. 08–AA–76.

District of Columbia Court of Appeals.

Argued March 12, 2010.

Decided Oct. 20, 2011.

Gregory L. Lattimer, Washington, DC, for petitioner.

Richard S. Love, Senior Assistant Attorney General for the District of Columbia, with whom Peter J. Nickles, Attorney General at the time the brief was filed,

Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before PRYOR, TERRY, and STEADMAN, Senior Judges.

TERRY, Senior Judge:

Petitioner Aziken operated a nightclub known as Smarta Broadway, located at 1919 Ninth Street, N.W., for which he held a Retailer's Class CN alcoholic beverage license. That license was revoked, following hearings held in the wake of the shooting death of a seventeen-year-old girl at the club. Mr. Aziken now argues that he was denied due process in the hearings before the Alcoholic Beverage Control Board ("the Board") and that the evidence was insufficient to support the Board's decision to revoke his license. We reject both arguments and affirm the final order of the Board.

I

The incident that led to the license revocation occurred on January 20, 2007, when a seventeen-year-old girl was shot and killed inside the club by the male companion of a disgruntled female patron who had been ejected from the club some time earlier. The shooter confronted the security personnel at the club, striking at them with his pistol and then firing a shot at one of them. The shot missed its intended target, but it struck and killed Taleshia Ford, another club patron.

In the aftermath of the shooting, the club was closed for ninety-six hours by the Chief of Police, Cathy Lanier, in accordance with District of Columbia law, pending a hearing to determine whether its continued operation presented an "imminent danger to the health and welfare of the public...." D.C.Code § 25–827(b)(1) (2011 Supp.). Before the ninety-six hours

expired, Chief Lanier formally requested that the Board revoke petitioner's license for public safety reasons, noting several other instances of criminal activity which had also been linked to the club. *See* D.C.Code § 25–827(a) (2011 Supp.) (authorizing Chief of Police to request suspension or revocation of a license under certain circumstances). The Board issued a notice to petitioner, directing him to show cause why his license should not be revoked and setting forth five specific charges, including: an increase in crime within 1000 feet of the establishment, permitting the use of controlled substances on the premises, operating under an unapproved name, allowing the establishment to be used for unlawful purposes, and violating certain alcoholic beverage regulations.

Hearings on the Chief's request to revoke petitioner's license were held on three dates: April 4, June 12, and September 25, 2007. In preparing for those hearings, petitioner requested subpoenas for various witnesses and documents. Specifically, he sought testimony by police officers, employees of a security service, and Police Chief Lanier, as well as discovery of the police department's records of calls for service at the club. These discovery requests were made on March 22, approximately two weeks before the scheduled date of the first hearing.

At the beginning of the April 4 hearing, petitioner objected to the proceedings because he had not received responses to all of his discovery requests. After reviewing those requests, the Board ruled that the hearing could proceed, but that petitioner could later recall any of the witnesses for further cross-examination after the requested discovery had been completed. Petitioner's request to subpoena the Chief of Police was denied, but responses to all of the other discovery requests were sub-

mitted by June 22, although petitioner chose not to recall any witnesses based on those responses. At the final hearing in September, petitioner conceded that there were no "procedural issues" outstanding.

Over the three days of hearings, approximately twenty witnesses testified about public safety incidents related to the club. In particular, Metropolitan Police Officers Patrick Burke and Larry McCoy testified that, on the basis of their personal knowledge acquired by responding to repeated incidents at the club, they assisted Police Chief Lanier in drafting the letter calling for the license revocation. Officer Burke told the Board that there were requests for police at the establishment on the night of the January 20 shooting, two months earlier for a fight that ended with a stabbing on November 19, 2006, and on another date in June 2006 when gunshots were fired outside after a fight spilled from the club onto the sidewalk. Officer McCoy testified that crime had vastly increased in the area since the club had opened, a change that he attributed to "drugs being sold, underage drinking, people getting stabbed, and then ultimately somebody getting killed" at the club.

Several other police officers also testified about their experiences in responding to complaints at the club. Their testimony included personal observations of crowd control problems, underage intoxicated patrons, and marijuana use at the club, as well as arrests for unlicensed possession of firearms on the premises. This testimony was corroborated by the former security supervisor for the club, David Lorenzo Smith. Mr. Smith testified that there were no consistent guidelines for security personnel, but that Mr. Aziken told him "not to worry about it" when he complained that patrons were frequently smoking marijuana in the club, and that underage patrons were being served alco-

hol almost every night. Smith told the Board that he had been ordered by Mr. Aziken to admit underage individuals but to increase their cover charge.

The testimony of Mr. Smith and the police officers about underage patrons and drinking was supported by testimony from other customers of the club, including eighteen-year-old Ashley Cunningham and twenty-year-old Tawana Gantt, both of whom frequently attended parties there. Ms. Cunningham confirmed that by paying an extra five dollars at the door, over and above the regular cover charge, she would be admitted without legal identification. She also testified that she and her friends had been served alcohol at the club, sometimes by Mr. Aziken himself, and that "everyone from around that neighborhood, all the younger kids go to that club [because] it's like the only club you can get into [at] that age." Ms. Gantt likewise testified to the additional cover charge for minors without identification. She also said that marijuana was commonly used at the club and that "every time" she was there she witnessed at least one fight. Another patron, a mother who rented the club for her son's band, testified that petitioner sold alcohol to minors, served alcohol after closing, and maintained a "VIP room" where patrons could smoke marijuana.

Ms. Cunningham was present on the night of the shooting. She testified that on January 20, 2007, she and three friends, all of whom were seventeen years old at the time—including Taleshia Ford—went to the club, where they had gone a few times before. The club was "very crowded"; Ms. Cunningham estimated that there were "more than 100" people there.

Mr. Aziken, the owner, was working as the bartender that night. As Ms. Cunningham and her friends sat listening to the music, they noticed a "commotion going on in the back. A gunshot was fired, and everybody ran." When the lights came on after a minute or so, Ms. Cunningham saw her friend Taleshia Ford lying on the floor. Police officers and paramedics soon arrived, and Ms. Ford was taken to a hospital, where she was pronounced dead about an hour later.[1]

Petitioner Aziken testified that his business was based primarily on leasing the club for parties and that the lessee for each event was responsible for security during that event. He also denied selling or authorizing the sale of alcohol to minors and denied permitting the use of controlled substances on the premises.

The Board issued an order on January 23, 2008, revoking petitioner's license to serve alcoholic beverages. Approximately one week later, Assistant Attorney General Amy Schmidt asked the Board to amend its order because it had failed to mention the June 12 hearing in its decision. Petitioner then filed a petition for review of the order on February 7. Several weeks later, on March 19, the Board issued a superseding order of revocation which included references to the proceedings on June 12. In that final order, the Board found that the club and its immediate vicinity were the scene of several crimes and expressly credited the testimony of Officers Burke and McCoy regarding the increase in criminal activity after the club's opening. Relying on testimony at all three hearings by police officers, security personnel, and patrons, the Board concluded that petitioner knowingly permitted the

---

1. The shooter was eventually apprehended, and in due course he was tried and convicted of second-degree murder while armed and related offenses. His conviction was affirmed by this court in an opinion issued today. *Mackabee v. United States,* 29 A.3d 952 (D.C. 2011).

use of controlled substances in the club and knowingly served alcohol to underage customers. It also found that petitioner had operated his establishment under an unapproved name.[2]

Petitioner now seeks review of the Board's final decision, claiming that he was not provided a fair hearing because he was denied the opportunity to have Police Chief Lanier testify and because he did not have the necessary documents from discovery available for all of the hearings. He also contends that the Board did not give him sufficient notice of its proposed order, which he claims was required because of the lack of a quorum. Finally, he argues that the evidence was insufficient to support the Board's findings of fact and conclusions of law.

## II

■ We begin by addressing petitioner's procedural objections to the hearing process. He contends that he was disadvantaged by not having completed the discovery process before the hearings began, that the testimony of Police Chief Lanier was essential to his case, and that the Board's final order was invalid because it failed to meet the statutory quorum requirement for the Board to act. Petitioner initially made his discovery requests on March 22, two months after the order to show cause was issued but less than two weeks before the first hearing on April 4. He received all of the discovery materials well in advance of the third and final hearing, which took place on September 25.

Neither at the hearings nor before this court has petitioner asserted that he was denied any document or that he was un-able to make effective use of the material provided to him through discovery. His argument before the Board was that, without the requested documents, he could not effectively cross-examine the witnesses presented at the first hearing on April 4 and therefore was "not prepared to go forward" on that date. In response to that argument, the Board specifically ruled that petitioner could recall any witness necessary for additional cross-examination after the requested discovery had been completed. Petitioner never sought to recall any witness at any hearing, however, and at the beginning of the final hearing in September he acknowledged that there were no "procedural issues or leftover items that we need to discuss or motions question." The single complaint that he now offers is that the testimony of Police Chief Lanier was wrongfully denied to him. His subpoena for the Chief to testify at the hearing was quashed on the ground that she had no personal knowledge of the incidents described in the testimony, and that her only involvement in the case was that she was required by statute to sign the letter requesting the license revocation. *See* D.C.Code § 25–827(a).

We have often and consistently held that "[a]dministrative and judicial efficiency require that all claims be first raised at the agency level to allow appropriate development and administrative response before judicial review." *Hughes v. District of Columbia Dep't of Employment Services,* 498 A.2d 567, 570–571 (D.C.1985) (citations omitted). We have also considered a related issue in a criminal case when deciding what sanctions, if any, should be imposed after certain documents were not produced

---

**2.** A Board investigator testified that although the license was issued in the name of Smarta Broadway, the name used on advertising was Club 1919. Petitioner himself, according to the Board's findings, testified "that he entered into a contract using the name Club 1919." The Board found that petitioner had "operate[d] his establishment under a name that was not approved by the Board, in violation of 23 DCMR § 600.1."

as required by the Jencks Act. In that case we said that "we must consider the relative importance of the lost or destroyed statements and the degree of prejudice resulting from the loss." *Slye v. United States*, 602 A.2d 135, 139 (D.C. 1992) (citation omitted). We think the same standard should be applied here.

We find it significant that petitioner did not renew his objection to the discovery delays before the agency at the conclusion of the final hearing. Nor has he given us any reason to believe that he suffered prejudice, or at least any prejudice that could not have been overcome had he chosen to exercise his option to recall witnesses and revisit their earlier testimony. As for petitioner's claim that his subpoena for testimony by Chief Lanier should not have been quashed, there is nothing in the record to suggest that her testimony would have added anything to the proceedings. We note in particular that her letter specifically referred to Officer McCoy as the source of her information, and that both of the officers who drafted the letter based on their personal knowledge of incidents at the club were present and testified at the hearing. The Board determined that there were no additional facts that Chief Lanier could have added, and petitioner has asserted none. Having no reason to conclude that the Board was mistaken, we hold that the Board committed no error in deciding to proceed with the hearings in parallel to the discovery process, without any need for live testimony by Chief Lanier. Nor can we conclude on the record before us that, even if a more specific objection had been made, any significant prejudice—indeed, any prejudice at all—resulted from the Board's decision.

For all of these reasons, we find no procedural error that would warrant reversal of the Board's final order.

## III

Petitioner also asserts that the license revocation order was invalid because it was signed by only three members of the Board. A fourth member was listed on the order, but that member did not sign it and had not been present at any of the hearings. Although petitioner did not object to the order before the Board, he now argues that three of the seven Board members do not constitute a quorum for the purpose of issuing such an order. Further, he claims that he should, at a minimum, have been served with a copy of the proposed order and given an opportunity to argue his case to a majority of the seven-member Board[3] because only two of the three signing members were present at all of the hearings; the third signing member did not attend all three hearings but reviewed the record of the proceedings from which he had been absent. *See* D.C.Code § 2–509(d) (2001) (stating that when a majority of those issuing a final order "did not personally hear the evidence," no adverse decision can be made "until a proposed order or decision . . . has been served upon the parties and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to a majority of those who are to render the order or decision").

Under D.C.Code § 25–431(b) (2001), the Board "may meet in panels of at least 3 members for the purpose of conducting hearings and taking official actions." The very next sentence states: "Three members shall constitute a quorum." Additionally, we note that each of the hearings in this case was attended by at least four, and sometimes five, of the seven board members.

---

3. *See* D.C.Code § 25–201(a) (2001) (Board    "shall be composed of 7 members").

Petitioner argues that the quorum requirements of section 25–431(b) apply only to the initial application process, since that section is codified as part of a statutory subchapter entitled "Review of License Applications." The statutory language itself refutes this argument, since it authorizes the Board, acting through three-member panels, not only to review applications but also to sit "for the purpose of conducting hearings and taking official actions," without any limitation on the type of "official actions" that a panel may take. Another statute (in the next subchapter) specifically authorizes "the Board"—which we interpret as any three-member panel of the Board, acting under the authority of section 25–431(b)—to hold hearings after issuing an order directing a licensee to show cause why his license should not be revoked in the face of evidence of violations of the alcoholic beverage regulations. *See* D.C.Code § 25–447(c) (2011 Supp.).

We think the more plausible reading of the statute—*i.e.*, section 25–431(b)—is to require a quorum of three Board members to conduct any hearing on a license revocation. That is what happened in this case; indeed, at various times the hearings were attended by four or five Board members. The final order of the Board was signed by three members, who constituted a quorum for the purpose of revoking petitioner's license. Even though one of the three signing members was not physically present at all three hearings,[4] the other two—who were present for all of the hearings and did "personally hear the evidence," as provided in D.C.Code § 2–509(d)—constituted a majority of the three-person quorum, making the notice provision of section 2–509(d) inapplicable.

■ This interpretation of the quorum requirement is further supported by the principle that, "[a]bsent statutory restrictions, the general rule is that a majority of a collective body constitutes a quorum, and a majority of the quorum is empowered to act for the body." *District of Columbia v. Konek*, 477 A.2d 730, 731 (D.C.1984) (holding that decision to terminate a member of the police force was valid even though only two of three members of the trial board participated in preparing the findings of fact and conclusions of law). In this instance a statute, D.C.Code § 25–431(b), specifically defines a quorum as three members of this particular seven-member Board. Thus we hold that the order issued in this case by three members of the Board showed on its face that it was the action of a quorum, and that even without the vote of the member who was not present at all three hearings, the two Board members who did attend each of the hearings constituted a majority of that quorum. The final order was therefore valid; the Board was not required to meet the further notice and argument requirements set forth in D.C.Code § 2–509(d) in cases in which no majority of those rendering the decision has "personally hear[d] the evidence."

### IV

■ Finally, we address petitioner's contention that the evidence was insufficient to support the Board's findings of fact and conclusions of law. He argues that the evidence he presented at the June 12 hearing was not considered by the Board, as shown by the Board's failure even to mention that hearing by date in its order. The flaw in this argument is that the order to which petitioner refers is not the final decision of the Board.

---

4. As we noted earlier, the third signing member did not attend all of the hearings, but a footnote in both of the Board's orders tells us that "he read the transcripts" of the hearings at which he was not physically present.

We review the decisions of the Board with deference. They will be upheld if they are in accordance with the law and supported by substantial evidence. *E.g., Tiger Wyk, Ltd. v. District of Columbia Alcoholic Beverage Control Board,* 825 A.2d 303, 307 (D.C.2003). When there is substantial evidence in the record to support the Board's decision, we will not substitute our judgment for that of the Board, "even though there may also be substantial evidence to support a contrary decision...." *Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board,* 500 A.2d 987, 992 (D.C. 1985) (citations omitted). We also defer to the Board's interpretation of the statutes that it is charged with administering unless that interpretation is arbitrary, capricious, or an abuse of discretion. *Smith v. District of Columbia Dep't of Employment Services,* 548 A.2d 95, 97 (D.C.1988).

While the initial order issued in January 2008 did fail to mention the June 12 hearing date, as pointed out by Assistant Attorney General Schmidt in her request for an amended order, the superseding order issued in March 2008 did incorporate and refer at some length to testimony from the June 12 hearing.[5] Even after explicitly considering this additional evidence, the Board reached the same conclusion in the March order as it had reached in its January order. In both instances, the Board credited—and cited—the testimony of numerous witnesses with respect to the underage drinking, the use of controlled substances, the repeated violent incidents, and security issues at the club. Finally, we note that the March order is the final order of the Board and is the only one before us for review. The January order, which is the subject of petitioner's complaint, is no longer in effect because it was superseded by the "amended" March order.[6]

We recognize that petitioner presented evidence supporting his version of the facts, but we think it is an overstatement to say that this evidence was ignored in the Board's final decision. It is more accurate to say that the Board heard conflicting testimony about whether marijuana use and underage drinking occurred at the club, but chose to credit the testimony of those who said that such illegal activities were regular occurrences there. In fact, the Board itself described the testimony to that effect as being "much more credible" than the evidence presented by petitioner. Given this express credibility finding and the testimony on which it was based, there is no way for us to conclude that the revocation of petitioner's license was unsupported by substantial evidence. Accordingly, we find no merit in petitioner's challenge to the sufficiency of the evidence before the Board.

The order of the Board revoking petitioner's license is therefore

*Affirmed.*

---

5. The January order is twelve pages long; the March order is seventeen pages long.

6. The March order did not say in so many words that it superseded the January order, but that was plainly its legal effect. The March order, which was entitled "Amended Findings of Fact, Conclusions of Law, and Order," stated that after the issuance of the January order,

the Board determined that it failed to include the testimony and evidence proffered in a hearing held on June 12, 2007, and thus it was not included in the initial Order. This amended Order contains all of the evidence and testimony admitted into evidence in this matter, but does not alter or modify the holding by the Board in the initial Order dated January 23, 2008, to revoke the Respondent's license.