**Jamel MACKABEE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 08–CF–1000.

District of Columbia Court of Appeals.

Argued Jan. 20, 2011.
Decided Oct. 20, 2011.

Tammy Sun, Public Defender Service, with whom James Klein and Alice Wang were on the brief, for appellant.

Elizabeth Gabriel, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Mary B. McCord, Fernando Campoamor–Sanchez and Robert J. Feitel, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, Associate Judges, and RUIZ, Associate Judge, Retired.*

THOMPSON, Associate Judge:

Jamel Mackabee was convicted by a jury of second-degree murder while armed, assault with intent to kill while armed, assault with a dangerous weapon, two counts of possession of a firearm during a crime of violence ("PFCV"), and carrying a pistol without a license. On appeal, he presents one principal issue for our consideration. He contends that he is entitled to a new trial under *Brady v. Maryland*[1] because the prosecution suppressed material exculpatory statements and information, providing them too late for appellant to use them effectively at trial and in preparing his defense, and because the trial judge refused to take remedial action to protect his rights, depriving him of a fair trial. He also asserts that his two convictions for PFCV should merge because the evidence was that he possessed "a single weapon during a single violent act."[2] The government agrees, and so do we, that the PFCV convictions merge. As to appellant's *Brady* claim, while the government's handling of its *Brady* obligations in this case is

troubling in a number of respects, we ultimately conclude that appellant is not entitled to reversal of his convictions. Accordingly, we remand for the trial court to vacate one of the PFCV convictions, but otherwise affirm the judgment of conviction.

## I.

This case arises from a shooting in the early morning hours of January 20, 2007, at Club 1919, a go-go club located near 9th and U Streets, N.W.[3] Nadine Dobbins, who was employed by a company called "Men in Black," was working security at the club that night, as were other security guards who were employed either by Men in Black or by the band that was playing at the club that night. Dobbins was stationed at the entrance to the club on the ground level, where patrons entering the club were searched for weapons and drugs. At around midnight, Lonika Atkinson[4] went to the club along with Chapale Warren, Vernon Plater, and two other individuals. Dobbins searched Atkinson at the club entrance. Dobbins testified that,

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (establishing that due process is violated where "evidence ... material either to guilt or to punishment" is suppressed by the prosecution).

2. *Nixon v. United States*, 730 A.2d 145, 153 (D.C.1999).

3. The record in this case indicates that the club was shut down shortly after the events that gave rise to this appeal (apparently because the club's admission of underage patrons violated alcohol beverage control regulations). (*See also Aziken v. District of Columbia Alcoholic Beverage Control Bd.*, 29 A.3d 965 (D.C.2011) (recounting that, in the aftermath of the shooting, the club was

immediately closed pending a hearing to determine whether its continued operation presented an "imminent danger to the health and welfare of the public ...," and that the club subsequently had its license to serve alcohol revoked.)) As a result, the trial court was informed, "people kind of dis[pe]rsed," making it difficult for investigators to get in touch with the security guards and others who were on the scene on the night of the shooting.

4. Atkinson was tried as appellant's co-defendant on charges that she conspired with him to commit (and therefore was vicariously liable for) the offenses with which he was charged. At the close of the government's case, the court granted Atkinson's motion for a judgment of acquittal, finding that the evidence was insufficient to support the charge of conspiracy. As a result, the conspiracy charge against appellant also was dismissed.

some time later, she heard Atkinson and a security guard named "Poochie" arguing at the top of the steps that led from the entrance of the club to the second floor. Poochie had placed Atkinson in a choke-hold and was attempting to eject her from the premises because she was smoking marijuana. Atkinson was visibly upset and told Poochie "he should not have put his hands on her." Atkinson angrily warned Poochie that "she was coming back" "with her folks" and stated, "I'll see you. You'll get yours." Atkinson left the club and, sometime thereafter, Poochie left the club as well.

After Atkinson was ejected from the club, Warren joined her in Plater's car where they sat together and listened to music for about half an hour. At some point, appellant knocked on the car window, and Atkinson got out of the car to talk with him. Warren could not hear their conversation, but could tell from Atkinson's gestures that Atkinson was explaining to appellant that Poochie had placed her in a choke-hold. Atkinson opened the car door and told Warren that she would be back but was going to see whether she would be barred from entering the club the next day.

Dobbins testified that, about 35 or 40 minutes after Atkinson had left the club, she (Atkinson) re-entered with appellant.[5] Dobbins was standing at the door with Robert Saunders, another of the security guards, and heard appellant ask for a promoter at the club named "Jamal." Dobbins told appellant that Jamal was not there that night, and appellant asked, "[W]here is the guy [Atkinson] had the argument with[?]" Either Dobbins or Saunders informed appellant that the person had left the club for the night. Dobbins then told Atkinson that she could not reenter the club, and Saunders told appellant that he had to be searched before he could enter.[6] Appellant warned Saunders that if he touched him, "both of y'all [Saunders and Dobbins] will get it." Dobbins testified that appellant patted his pocket as he said this, a gesture that Dobbins understood to mean that appellant had a weapon. Saunders testified that appellant told him not to touch Atkinson and then asked Atkinson "how the person looked." Atkinson replied that "he's doing security here." At that, appellant "rushed upstairs," while Atkinson stayed downstairs with Dobbins and Saunders.

On the second floor, bouncer Earl Caldwell was alerted to appellant's presence by the club's cashier, who informed Caldwell that appellant had not paid the admission charge.[7] Caldwell grabbed appellant's shoulder, and appellant "swung away" from him. Caldwell testified that appellant then pulled out a silver gun and warned Caldwell, "Get off me before I shoot you." Caldwell put his hands up (as if in surrender) and said, "[Y]ou got it." Appellant, however, took two steps towards Caldwell and hit him across the face with the gun. Appellant then backed away from Caldwell, swung the gun in the air, reached his arm out, and shot in the direction of Caldwell. Caldwell had turned

5. Dobbins identified appellant from one of a set of photographs that had been taken by a professional photographer at the club on a different night.

6. Saunders identified appellant from one of the club photographs and in court.

7. Caldwell, who was employed by the band, was stationed near the cashier, right at the top of the steps that led from the entrance of the club to the second floor. His job that night was to make sure that each patron entering the club paid. Like Dobbins and Saunders, Caldwell identified appellant from a photograph that had been taken at the club on another night.

sideways just before appellant fired the gun, and the bullet hit 17–year–old Taleshia Ford, instead of Caldwell. Ford died shortly after the shooting of a gunshot wound to the chest and right arm.

Arthur Green, a sound technician who was working at the club that evening, testified that he saw the confrontation between Caldwell and the man that Caldwell tapped on the shoulder.[8] Green saw the man hit Caldwell with a silver gun.[9] Seconds later, Green heard a gunshot and saw one of the patrons (Ford) fall, but did not actually see the shot fired. Dobbins and Saunders were still standing at the entrance of the club when they, too, heard the gunshot. Dobbins testified that about two or three seconds later, she saw appellant come down the stairs and walk out of the club with Atkinson.[10] Saunders testified that he saw a gun in appellant's hand as he (appellant) walked out of the club.

The defense did not call any witnesses, but pressed a theory of mistaken identity and, through questioning of Caldwell, suggested that Caldwell had a gun and fired it during the altercation, accidentally striking

Ford. The gun that fired the fatal shot was never recovered, and no physical or scientific evidence linked appellant to the shooting.

## II.

Appellant's *Brady* arguments focus on two pieces of evidence: (1) a description of the shooter provided by Green in a videotaped statement he gave to police, and (2) a viewing sheet prepared after Pierre Swails, a witness to the shooting, did not identify appellant's photo but pointed to two other individuals depicted in a set of photographs and stated, "it [the shooter] sort of looks like one of these guys." We discuss each of these separately.

### A. *Green's Videotaped Statement*

▌ Jury selection began in appellant's case on Wednesday, April 9, 2008, and the presentation of evidence began on April 10. On the preceding Thursday, April 3, the government turned over to the defense for the first time a copy of the videotaped statement that Green gave to police on January 20, 2007, the day of the shooting.[11]

---

8. Green was unable to identify the man with the gun from photographs.

9. At the time, the man with the gun had his back to Green, who was standing about 18 feet away.

10. Dobbins testified that after appellant rushed up the stairs after refusing to be searched, and after the gunshot, it "happened ... quick" that Mackabee "was back down the steps and [Mackabee and Atkinson] walked off." Many other club patrons remained on the second floor, crowding around the victim.

11. One of the prosecutors explained that he had become involved in the case only recently, had seen the videotape only when he started reviewing evidence in the case a few weeks earlier, and understood a week or two ago that the videotape was "potentially exculpatory," but "came to the conclusion [with co-

counsel] that it was not the kind of exculpatory information that we would immediately go around and turn over." We are at a loss to understand this reasoning. As the Supreme Court has counseled, recognizing the government's weighty responsibility to protect due process, "[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure," as disclosure "will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles v. Whitley,* 514 U.S. 419, 439–40, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). As this court has said, "a prosecutor's timely disclosure obligation with respect to *Brady* material cannot be overemphasized, and the practice of delayed production must be disapproved and discouraged." *Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) (quoting *United States v. Starusko,* 729 F.2d 256, 261 (3d Cir.1984)) (internal quotation

The transcript of the videotaped statement indicates that Green gave police his address and telephone numbers, told police that he heard "one bang" and that the shooter, who "had the gun in his right hand," was wearing a "three-quarters length" jacket that "looked like a light color green" and was "about thirty-one, thirty-two, something like early thirties" and "probably about 6', somewhere under maybe 6' ... 6' ... 6'1″ maybe" and "solid ... probably around about two ... probably about two fifty [pounds]." [12] Green also told police that when the shooter "stood up to the security dude [Caldwell, who, the record suggests, weighed in the neighborhood of 300–315 pounds and was about 6 feet 3 inches tall], they look almost the same size." Thus, as the trial judge recognized, Green gave police "a physical description that could not match Mr. Mackabee." [13]

At the next court appearance on April 7, defense counsel challenged the government's delay in turning over the Green videotape as a *Brady* violation and asked the trial court to dismiss the case, to impose some other sanction, or at least to grant a continuance. The trial court agreed with defense counsel that it "isn't even a close question" that Green's statement was "exculpatory" *Brady* information.[14] The court declined to order the sanctions that the defense requested, however, because, as the colloquy ensued, the court learned that the government had turned over to the defense, as page 121 of a 178–page discovery package sent to defense counsel on February 15, 2007 ("the February 2007 discovery package"), a copy of a police officer's (redacted) handwritten notes of the statement given by Green. In pertinent part, the notes read:

marks omitted). That said, "[w]e do not reverse convictions in order to punish prosecutors." *Shelton v. United States*, 983 A.2d 363, 372 (D.C.2009).

12. By contrast, Daniel Whalen, one of the detectives who investigated the case, testified at a pre-trial hearing that Atkinson gave police the following description of appellant: "Black male, dark complexion 19 to 20 years old, 5'6 to 5'10 in height, thin build dreadlock style hair, wearing a grey coat, known by the nickname of Wheezy." Dobbins told police that the man she saw "had a light gray coat on, blue jeans, braids, about 5'8." Caldwell told police that the shooter was "a black male, dark complexion, late 20s, thin build, under 6 feet in height with deadlocked [*sic* ] hair wearing a grey jacket or coat" (but acknowledged at trial that he told the grand jury that the coat was "tan or gold"). Saunders described the man he saw as having "dark skin, dreads to shoulders, grey coat, about 6 feet tall, 185, early 20s."

13. No evidence was presented to the jury about appellant's weight and height at the time of the shooting, but, during the closing argument, defense counsel asked appellant to stand up so that the jury could see that he

was much shorter than six feet and much lighter in weight than 250 pounds.

14. The experienced trial judge chastised the prosecutors, saying:

When you [the government] are in possession of information that is not helpful to your case and is potentially exculpatory in [the defense] case, ... your obligation is to turn it over timely, reasonably. And I don't know whether it's a question of training or just misunderstanding of what the requirements of [*Brady* ] are, but the government seems to have the view that we can hold [exculpatory evidence] until the last minute, as long as we give it over, we've fulfilled our obligation.... You have to hand it over as soon as its exculpatory nature becomes apparent or reasonably apparent to any reasonable objective observer.

As the trial judge implicitly recognized, timely disclosure "serve[s] to justify trust in the prosecutor as 'the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *Kyles*, 514 U.S. at 441–42, 115 S.Ct. 1555 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

B/M Ear 30's 6'–6'1
SOLID BLD. 250
POSS. GREEN COAT 3/4 LGT
GUN IN Rt. HAND
SHINY GUN—silv.
ONLY 1 shot.

The court regarded the fact that the government had produced these notes in its discovery packet as "a very important fact," observing that the notes enabled the defense to see, a year earlier, that "some witness describes the person with a gun in his right hand who presumably is the shooter." Although acknowledging defense counsel's complaint that the redacted notes (unlike the videotape) did not disclose identifying information about the witness, the court observed that defense counsel "had since February [2007] the description that . . . was the only exculpatory part." The court told defense counsel that, had she asked the government for contact information about the witness and met with a refusal and then asked the court to require the government to disclose the witness's identity, "you would have had the name" (presumably, because the court would have ordered disclosure). The prosecutor told the court that no one in his office had yet interviewed Green, but gave the court his contact information. The court concluded the discussion by giving defense counsel Green's contact information.

During her brief (six transcript pages) cross-examination of Green at trial,[15] defense counsel elicited Green's testimony that the man with the gun was "almost the same size as [Caldwell]" and was "built like [Caldwell]," and was "[b]etween 200 and 250" pounds.[16] Counsel also elicited Green's agreement that he turned and looked at the man as he "came into the club" (i.e., did not merely see the man's back), and thereafter "couldn't identify the shooter in the photographs" that included a photo of appellant. In addition, counsel confronted Green with his videotaped statements to police that the man with the gun wore a light-colored green coat and had a solid build (statements that Green denied making). Counsel emphasized the same points in closing argument, *inter alia*, asking the jury whether appellant "look[s] anywhere near the size of Earl Caldwell[.]"

Upon this record, appellant argues that "the government suppressed material exculpatory information until it was too late for [appellant] to use it effectively in developing and presenting his defense," and that the trial court's "failure to find a due process violation under *Brady* " and to impose sanctions was reversible error. Appellant highlights the statement by a prosecutor (not one of the prosecutors who tried the case), in her cover letter accompanying the February 2007 discovery package, that, "[i]n response to your request for *Brady* information, please note that the government is not aware of any such information in this case." In light of that statement, appellant argues, the defense had no reason to think that what was contained in the officer's notes (a description that "could not match Mr. Mackabee") was an eyewitness's description of the shooter. Accordingly, appellant asserts, even if the officer's notes sufficiently me-

---

15. The cross-examination took place on April 17, 2008, ten days after the court passed along to defense counsel Green's contact information.

16. Green insisted that he told police that the shooter weighed between 200 and 250 pounds (not "specifically 250 pounds," as defense counsel suggested). On re-direct, the government elicited from Green an explanation that he was not wearing his glasses on the evening of the shooting, that the shooter had his back to him, and that he was not 100 percent sure of the description he gave.

morialized the statement contained in the videotape, his counsel was not alerted to the exculpatory information that she needed to investigate and otherwise prepare his defense.

 The principle established by *Brady* is that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. Accordingly, "the prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure." *Edelen v. United States*, 627 A.2d 968, 970 (D.C. 1993) (citation and internal quotation marks omitted). For there to be a true *Brady* violation, "(1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2)[the] evidence must have been suppressed by the [government], either willfully or inadvertently; and (3) prejudice must have ensued," meaning that the suppressed evidence must have been material. *Fortson v. United States*, 979 A.2d 643, 662 (D.C.2009) (quoting *Perez v. United States*, 968 A.2d 39, 65 (D.C. 2009)) (internal quotation marks omitted).[17] Evidence is material where "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009) (citation omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Appellant has the burden of proving a *Brady* violation. *United States v. Wright*, 506 F.3d 1293, 1301 (10th Cir.2007); *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir.2001); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

 As we explained recently in *Miller v. United States*, 14 A.3d 1094 (D.C.2011), whether a defendant has established a violation by the government of its obligations under *Brady* "presents a mixed question of fact and law," calling for us to "review the [trial] court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard." *Id.* at 1120. Where the issue to be resolved is not one of "historical fact[ ] relevant to the *Brady* issues," *id.* at 1121, but instead "concerns the legal consequences" of historical facts, *id.*, our review is *de novo*. *Id.* at 1123.

We agree with appellant (and the government does not dispute) that the description that Green·gave of the perpetrator during his videotaped interview was exculpatory, but we cannot agree that the government's delay in turning over the videotape amounted to a true *Brady* violation.[18] Suppression in the *Brady* sense would have occurred if the material was "not 'disclos[ed]' in sufficient time to afford the defense an opportunity for use.'"

---

17. *See Bennett v. United States*, 763 A.2d 1117, 1125 n. 9 (D.C.2000) (referring to "materiality—hence prejudice").

18. As the Supreme Court has recognized, "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* materi-al'—although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

*United States v. Douglas,* 525 F.3d 225, 245 (2d Cir.2008) (*"Brady* material that is not 'disclos[ed] in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the *Brady* doctrine." (quoting *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir.2001))); *see also Edelen,* 627 A.2d at 971 ("[W]here the defendant receives potentially exculpatory information in time to use it effectively at trial, his conviction will be sustained."). In this case, however, defense counsel, who had the videotape and the contact information for Green a few days before trial began and several days before her cross-examination of Green, was able to make effective use of Green's videotaped statements at trial. As described above, in cross-examining Green, defense counsel highlighted for the jury Green's opportunity to see the shooter as he came into the club (and thus, not to see just the shooter's back), and emphasized, both through cross-examination and in closing argument, the disparity between Green's description of the shooter and appellant's characteristics. Defense counsel made particularly effective use of a detail contained in the videotape but not in the officer's notes—i.e., that when the shooter "stood up to [Caldwell], they look almost the same size." Appellant does not suggest how, had Green's videotaped statement been turned over earlier, his counsel could have used its contents any more effectively at trial.[19]

Appellant also contends that the delayed disclosure of Green's videotaped statement deprived appellant of the opportunity to "investigate a potential third-party perpetrator matching the description that Mr. Green gave the police." This argument also is not persuasive, because we agree with the trial judge that the officer's notes contained what was unambiguously a description of the perpetrator—the same description of the assailant recorded in the videotape. In addition, as discussed *infra,* the documents related to Swails alerted the defense to the need to investigate a

---

19. Appellant does argue that the delayed disclosure of the videotape and Green's contact information deprived him of the opportunity to "develop Mr. Green as a defense witness." He asserts that the late disclosure prejudiced the defense "by solidifying Green's allegiance to the government and rendering him an ineffective witness for the defense." We are not persuaded by this argument. Appellant does not assert that Green refused to speak with defense counsel or her investigator. The record shows that, as of April 7, 2008, when the defense was given Green's contact information, the prosecutors had not yet spoken with Green. Defense counsel and the defense investigator had spoken to Green very briefly (for "some seconds") in the hallway outside the courtroom on April 3, before the government had turned over the Green videotape. In other words, defense counsel had just as much opportunity as the prosecutors did to interview Green before he formed any sort of allegiance to one side or the other. Appellant also points to what he terms Green's "obvious preference for the government," as evidenced by his "remarkably hostile" responses during cross-examination, and argues that Green "was willing to perjure himself by denying that he had given the police certain exculpatory details [such as his statement that the shooter wore a light green coat]." However, from the transcript, we do not discern that Green's testimony was (as appellant asserts) hostile or "stripped ... of any exculpatory value." Further, appellant's argument about Green's "perjury" ignores the possibility that Green simply did not remember exactly what he had told police. In any event, we note that during his videotaped interview, Green remarked to the detective that he "didn't really think that [Atkinson's ejection from the club] was that serious for her to go get somebody and come back," that once Caldwell "put his hands up" (as if in surrender), "things could've been avoided," and that the shooting was "unnecessary." Thus, in January 2007, Green already had expressed a negative view of the shooter, and it is purely speculative that, through earlier contact with the defense team, Green could have been rendered more willing to assist the defense case.

possible third-party-perpetrator defense. Finally, appellant's mere speculation that earlier contact with Green might have led the defense to discovery of additional exculpatory evidence is insufficient to establish a *Brady* violation. *See United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

### B. Pierre Swails

■ On April 3, 2008—six days before trial commenced—the court held a hearing on the defense motion to suppress the club-photo identifications of appellant on the ground of suggestivity. During that hearing, Detective Whalen, one of the detectives who participated in the photo identification procedures, testified about witnesses who viewed the club photographs but did not identify appellant. The prosecutor told the court that the name of one of the witnesses was Pierre Swails, and explained that, without disclosing Swails's name, the government had provided a redacted write-up of a detective's interview with Swails as part of the February 2007 discovery packet. The prosecutor also read aloud a portion of a letter that the government had sent to the defense on March 12, 2008, in which the government had referred to Swails, again without disclosing his name. The March 12, 2008 letter included the following statements:

> Another witness, who will testify at trial, was shown multiple club photographs and could not identify the shooter for sure, but pointed at two males and said "it sort of looks like one of these guys." Apparently, no photo viewing sheet was prepared for this witness. It is not known which club photo the witness was looking at, nor is it known which two males the witness was pointing out, though the witness did give an oral statement to police . . . , already provided in discovery, that the shooter was wearing a gray North Face coat (like the one seized from Mr. Mackabee) and that the witness saw a black male pull out a handgun and shoot the girl.

Upon hearing Detective Whalen's testimony and the prosecutor's remarks, appellant's defense counsel realized for the first time that witness Swails not only had failed to single appellant out from among the club group photos, but had pointed to two other men shown in one of the group photographs as resembling the shooter. Defense counsel told the court that she had previously "assumed that the guy had pointed out a picture of my client and a picture of someone else. But now it comes to light that he picked out two other people." Telling the court that "this is not just a failure to identify," but "an identification of two other people," defense counsel challenged the government's failure to provide this information earlier as a *Brady* violation. The court heard testimony and arguments on the issue at the April 7, 2008 proceeding.

At the April 7 hearing, Detective Whalen further testified that Government Exhibit 5 was the photograph containing the two men that Swails chose, and that the two men at the opposite ends of the photo were the two men he said "sort of look[ed]" like the shooter. Whalen's testimony made apparent that the prosecutor had been incorrect in stating, in the March 12 letter, that "[i]t is not known which club photo the witness was looking at, nor is it known which two males the witness was pointing out." Thereupon, defense counsel requested a sanction for the government's *Brady* violation or at least a one- or two-day continuance so that she could locate

Swails.[20] The trial court questioned whether the information constituted exculpatory *Brady* information and characterized it as a mere "failure to identify." The court denied defense counsel's request for sanctions or for a continuance but ordered the government to disclose Swails's contact information to the defense. The next day (one day before trial), defense counsel reported that she had been unable to locate Swails using the contact information provided by the government and that the government also could not find him. Defense counsel renewed her request for a continuance, which the trial court denied. Swails did not testify at trial, and, as appellant's brief decries, "the jury never heard evidence that a witness who saw the shooting did not identify Mr. Mackabee as the shooter."

On appeal, appellant renews his claim that the government violated *Brady* by failing to make timely disclosures about Swails, and argues that the government's conduct "cost [him] the opportunity to present Mr. Swail's exculpatory testimony at trial, and to investigate the two men he identified as the likely shooter in support of a potential third-party perpetrator defense." Appellant also asserts that Swails's testimony "would have critically bolstered the credibility of Mr. Green's description of the perpetrator as someone other than [appellant]."

Appellant's *Brady* claim related to Swails presents questions of both whether the evidence was exculpatory, and whether the evidence was suppressed. We begin our analysis by observing that Swails's failure to identify appellant from the club photographs was not itself exculpatory.

*See Johnson v. United States*, 544 A.2d 270, 275 (D.C.1988) (mere failure of a witness to make an identification is not exculpatory); *see also Davis v. United States*, 735 A.2d 467, 476 n. 14 (D.C.1999) (failure to identify not exculpatory); *United States v. Rezaq*, 156 F.R.D. 514, 518 (D.D.C. 1994), *vacated in part*, 899 F.Supp. 697 (D.D.C.1995) (witness's remark that he was unable to finger defendant is neutral, not exculpatory). What appellant asserts was exculpatory (the government asserts that it was merely "marginally favorable" and of "little exculpatory value") is that Swails pointed to two other individuals in the photographs, saying that the shooter "sort of looks like one of these guys," while not pointing to appellant. We can assume without further discussion that this quasi-identification was truly exculpatory—certainly, it was evidence "of a kind that would suggest to any prosecutor that the defense would want to know about it,"[21] a test that we have called an "eminently sensible standard" for whether evidence is exculpatory[22]—because the dispositive issue is whether it was material. As already discussed, for the materiality test to be met, "prejudice must have ensued"[23] from the non-disclosure. That is, there must be "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 129 S.Ct. at 1783. Here, these criteria are not met, and thus we are not persuaded that the government suppressed material information.

To begin with, we cannot conclude that prejudice ensued from the government's delay in providing more information about

---

20. Defense counsel advised the court that, in February 2007, she had attempted to locate Swails (whose name and other identifying information she did not know at the time), but had not been successful in doing so.

21. *Leka*, 257 F.3d at 99.

22. *Miller*, 14 A.3d at 1100.

23. *Fortson*, 979 A.2d at 662.

Swails because the February 2007 discovery package provided the defense with investigatory leads as to Swails. One of the documents in the package was a "Complainant Witness Statement" taken by Officer Bryan Kasul on January 20, 2007, stating that the witness (who, prosecutors confirmed at the April 7 hearing, was Swails) "was in the club performing on stage with a band" and at some point "saw a black male, who wore a gray North Face coat, pull out a handgun and shoot the gun." Thus, even before the government disclosed Swails's identity, defense counsel had information that he was "a member of the band 3D" (i.e., Three Dimension Band, the band that was playing at the club on the night of the shooting).[24] In addition, Detective Waid's redacted report of the interview with Swails contains the unredacted information "Peace-a-holics," so the defense had this information about Swails's affiliation as well. And, indeed, defense counsel told the court that when she received the discovery packet from the government, she tried to find the witness through contact with Peace-a-holics, but was unsuccessful.[25] As already noted, the club was closed shortly after the murder, cutting off one point of access to witnesses,

and possibly contributing to defense counsel's inability to find Swails when she received the February 2007 discovery package. It appears that this, rather than the timing of the disclosure of identifying information about Swails, was a principal cause of why neither side was able to find him to testify at trial. *Cf. Curry v. United States,* 658 A.2d 193, 198 (D.C.1995) (upholding trial court finding that, because witness "Jones probably would not have been located even if the defense had learned of his statement at or about the time the indictment was returned" and because "it would have been extremely difficult to locate him" even at that time, defendant was not prejudiced by government's late disclosure of Jones's exculpatory statement).[26]

■ Further, appellant's challenge rests in large measure on the possibility that, through fuller and earlier disclosure, the defense team might have spoken with Swails, might have been able to locate the two men who "sort of look like" the shooter, and might have uncovered information to undermine the government's theory that appellant was the assailant.[27] But it is not

---

**24.** The trial court commented that from the information that a witness "was in the band[,] I would have thought you would have been able to identify him if you wanted to," a seemingly apt observation.

**25.** Nothing in the record indicates that defense counsel requested further identifying information from the government when she encountered difficulties locating the unidentified witness through Peace-a-holics.

**26.** Thus, even if the trial court erred in denying the continuance the defense requested, we conclude that there is no reasonable probability that it would have altered the outcome.

We hasten to add, however, that the government clearly ought to have done more to meet its continuing responsibilities in this case than it had done before incorrectly asserting, in the March 12, 2008 letter to defense counsel, that

"[i]t is not known which club photo [Swails] was looking at, nor is it known which two males [Swails] was pointing out." When asked by the court about these matters, Detective Whalen replied without hesitation that Detective Waid knew details about the Swails identification that he (Detective Whalen) did not, and, having spoken with Waid during a break in the proceedings, Whalen was able to testify about which men Swails had selected. We presume that the prosecutors could just as easily have made this inquiry and obtained the same information.

**27.** *Cf. Miller,* 14 A.3d at 1111 ("[E]xculpatory evidence must be disclosed in time for the defense to be able to use it effectively, not only in the presentation of its case, but also in its trial preparation.").

enough for appellant to describe a "mere possibility that [the] undisclosed information might have helped the defense, or might have affected the outcome of the trial." [28] For several reasons, he has not shown "a reasonable *probability* of a different result" had the disclosure occurred earlier. *Strickler,* 527 U.S. at 291, 119 S.Ct. 1936 (emphasis in the original). For one thing, as the trial judge observed, there was "not any other evidence that anybody else picked either of those two people" (that Swails picked) as the man with the gun (and there is no evidence that either of them was in the club on the night of the shooting). For another, appellant's argument that Swails's testimony would have bolstered Green's testimony and would have "directly challenge[d] Mr. Caldwell's identification of Mackabee as the shooter" involves little more than speculation. Green thought the shooter stood at least six feet tall and weighed 200 to 250 pounds, while Swails told police that the shooter resembled two men who (as observed by the trial judge) "appear[ed] to be about 5 feet 10 inches" and whose thin build more closely resembled that of appellant in the club photo than that of the much larger Caldwell.[29] In addition, like other eyewitnesses to events in the club (Caldwell, Dobbins, Saunders, and Atkinson,[30] all of whom told police that appellant was wearing a gray coat), Swails told police that the shooter was wearing a gray North Face coat (and police seized a "black-and-gray North Face jacket" from appellant's home after the murder). *Cf.*

*Cotton v. United States,* 388 A.2d 865, 873 (D.C.1978) ("The remote possibility that the evidence which the government failed to produce might have been favorable to the defense is not, by itself, sufficient to invoke the principles of *Brady.*" (quoting *March v. United States,* 362 A.2d 691, 703 (D.C.1976))).

Finally, we are not persuaded that the information about Swails's having selected the images of two other men from a group photograph, while not identifying appellant from a similar group photograph, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler,* 527 U.S. at 290, 119 S.Ct. 1936 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555). The potential impeachment that appellant claims would have been possible with Swails's testimony has to be viewed in the context of all the evidence at trial, which included appellant's motive to get back at the individual at the club who had mistreated Atkinson; the testimony of Dobbins and Saunders, identifying appellant as the person they saw enter the club immediately before the shooting, after refusing to be searched and threatening them, and then saw leave within "seconds" after the shooting, with a gun in his hand; Caldwell's identification that appellant was the shooter; and the similarity between the North Face coat several witnesses said the shooter wore and the one found in appellant's home. In short, the evidence that appellant was the shooter was strong (if not

---

**28.** *Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392.

**29.** As depicted in the club photograph in which he appears, appellant (who was 19–years–old at the time of the shooting) is a *slender* black male with long braided hair or dreadlocks. His dreadlocks seem to be the same length as those worn by the two men whose photographs Swails chose, his facial hair is similar to theirs, and his complexion is

about the same as the darker of the two men that Swails picked out.

The trial judge commented that the two men Swails chose "at least generally fit the same description" as appellant. Defense counsel likewise commented that the two men whom Swails picked out were "pretty close to the description."

**30.** See note 12, *supra.*

overwhelming), and the matters discussed above do not undermine our confidence in the outcome of appellant's trial.

## III.

We remand for the trial court to vacate one of appellant's PFCV convictions. In all other respects, for the foregoing reasons, the judgment of conviction is

*Affirmed.*