*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CO-688

PATRICK F. ANDREWS, APPELLANT,

V.

UNITED STATES, APPELLEE.

FILED **03/15/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(FEL5460-00)

(Hon. Ronna Lee Beck, Motions Judge)

(Argued November 30, 2016                    Decided February 22, 2018)
(Amended March 15, 2018)[+]

*Michael S. Bailey*, with whom *Donald P. Salzman* and *Michael A. McIntosh* were on the brief, for appellant.

*Lauren R. Bates* for appellee.

*Channing D. Phillips*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman*, *John P. Mannarino*, *T. Anthony Quinn*, *Stephen F. Rickard*, and *Ann K. H. Simon*, Assistant United States Attorneys, were on the brief, for appellee.

---

[+] After the February 22, 2018, initial publication of this opinion, this court amended the opinion by deleting references to credibility findings involving the *Brady* motion and adding language from the trial court's oral ruling.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] and WASHINGTON[**] and STEADMAN, *Senior Judges*.

WASHINGTON, *Senior Judge*: On May 15, 2002, a jury convicted appellant Patrick F. Andrews and his co-defendant, Randall Mack, of the first-degree premeditated murder while armed of Deyon Rivers, and of additional firearms related offenses arising out of the shooting. Appellant filed both direct and collateral appeals, which were affirmed and denied respectively. In this appeal, his second collateral appeal, appellant raises two new constitutional claims: a *Brady*[1] claim for the government's suppression of statements by a critical witness, and ineffective assistance of counsel claims for his trial attorney's conflicts of interest with two possible third party perpetrators. The trial court granted an evidentiary hearing on these issues but ultimately denied appellant's § 23-110 motion. For the reasons stated below, we affirm.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on March 18, 2017.

[**] Judge Washington was Chief Judge of the court at the time of argument. His status changed to Senior Judge on March 20, 2017.

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

**I.**

**The Murder of Deyon Rivers**

Appellant and Mack were convicted of the July 7, 2000, first-degree premeditated murder of Deyon Rivers, while Rivers sat in his car near the corner of 18th and C Streets, N.E. We affirmed appellant's conviction on direct appeal, and denied his subsequent request for relief alleging ineffective assistance of counsel. *See Andrews v. United States* (*Andrews I*), 922 A.2d 449 (D.C. 2007); *Andrews v. United States* (*Andrews II*), No. 07-CO-867, Mem. Op. & J. (D.C. June 3, 2008).

The shooting of Rivers occurred in the wake of an altercation the previous day between Rivers and David Braddy, who was a friend of both appellant and Mack. Braddy had complained to appellant and Mack that Rivers, who did not live in the neighborhood, had shot "bottle rockets," one of which had almost hit Braddy's girlfriend. Braddy was angry about the incident, but the altercation ended without violence.

At the time of the confrontation between Rivers and Braddy, the latter was purportedly in the company of Morris Jones, then fifteen years old. Jones, who

suffered from a learning disability as well as low intellectual functioning and substance abuse, was a principal prosecution witness at the trial. According to Jones, he and Braddy spoke with appellant and Mack shortly after Braddy's encounter with Rivers, where Braddy told them what had occurred. Later in the evening, well after midnight, Jones and Braddy were sitting on the porch of Braddy's home, drinking alcohol and smoking marijuana. According to Jones, Braddy received a telephone call and went into the house, leaving Jones alone on the porch. After Braddy's departure, Jones saw a car pull up to the corner of 18th and C Streets. He recognized the driver as the individual who had fired the "bottle rocket" near Braddy's girlfriend. At this point, appellant and Mack came out of an alley and fired handguns into the vehicle. Jones further testified that he and Braddy encountered appellant on the following day and inquired about the events of the previous night. Appellant told them that he had seen "a suspicious car coming down the street," that he had become "paranoid or something like that," and that he had shot at the car. Jones is the sole witness to place appellant at the crime scene; there was no forensic evidence linking appellant to the murder.[2]

---

[2] We expressed skepticism in appellant's first appeal as to the government's motive that would have led appellant and his codefendant to kill Rivers, noting that "an incident with a firecracker which could have struck, but did not strike, *someone else's* girlfriend is . . . 'something of a stretch.'" *Andrews I*, 922 A.2d at 463 (emphasis in original).

On July 21, 2000, approximately two weeks after the shooting, an officer observed an unoccupied burgundy-colored Cadillac in the 300 block of 17th Place, N.E., with an expired rear paper license tag. The officer opened the door of the Cadillac, (which, remarkably, was unlocked) for the purpose, *inter alia*, of checking the tag against the VIN number. Inside the vehicle, he observed a black ammunition magazine protruding beneath the driver's seat in plain view. The officer called for Crime Scene Search Officers, and they subsequently recovered a Glock 17 semi-automatic pistol loaded with a single round of ammunition, as well as a clip containing 26 rounds. This weapon was ultimately identified as having fired fourteen of the sixteen spent cartridges recovered near Rivers' body.

Inside the car, officers found a number of items linking it to appellant. These items included: (1) a vial of prescription medicine in appellant's name; (2) an envelope addressed to appellant; (3) several traffic citations for moving violations, all issued to appellant; and (4) an empty bottle of Vodka with appellant's right palm print on it. The registration was in the name of Deon Long, who was the girlfriend of a friend of appellant. She testified appellant had asked her to "sign for" a loan for a car that appellant wanted to buy. Ms. Long signed the paperwork, and appellant took possession of the vehicle. Evidence was also recovered that suggested individuals other than appellant used the vehicle: (1) a

hotel receipt with Octavian Brown's name on it, (2) a probation report and referral for drug and alcohol testing for Douglas Quander, and (3) an empty bottle of Vodka found in the Cadillac with twelve usable prints, two of which matched appellant.

While Jones did not report the shooting to police, investigating officers apparently learned that he may have been a witness. On August 22, 2000, the police brought him to the United States Attorney's Office for questioning. By this time, appellant and Mack were the primary suspects because police had recovered the two pistols with which the decedent had been shot to death and each weapon had been in the possession of one of the two defendants. Jones initially told the police that he knew nothing about the shooting, but after being questioned for approximately three hours, Jones identified appellant and Mack as the shooters. He was immediately taken before the grand jury, where he repeated his identification of the defendants.

At trial, Mack presented the testimony of James Braddy, David Braddy's father. According to James Braddy, he, his wife, and his son were inside the house watching television for a "couple of hours" prior to the shooting. When he heard shots, James Braddy went to the porch to investigate, and Jones was not there.

Indeed, James Braddy testified that he had not seen Jones anywhere, either that night or on the previous day. He, however, admitted that he had retired upstairs for bed thirty minutes prior to the shooting.

### David Braddy's Statements and Grand Jury Testimony

The government did not call David Braddy to testify at trial, instead relying on Jones's testimony. Appellant and his codefendant also did not call Braddy to testify in part due to his refusal to speak with defense counsel and their investigators prior to the trial. However, the government had both Braddy's videotaped statements to police and his grand jury testimony in its possession. The government only disclosed limited statements as part of its *Brady* obligation, noting a single contradiction between David Braddy and Jones's accounts; specifically, Braddy was home alone on the night of the shooting. Braddy's grand jury testimony, however, differed markedly from Jones's trial testimony. Appellant notes six major contradictions, where either Braddy excludes Jones's presence from key events or Braddy's account markedly differs from Jones's. In addition, Braddy's videotaped interview with police contradicted his grand jury testimony in several respects.

## Co-defendant Randall Mack's Retrial[3]

Although the government failed to disclose Braddy's statements for appellant and co-defendant Mack's original trial, the government disclosed the testimony in Mack's retrial. Mack's defense opted this time to call Braddy to testify. Braddy testified that Jones was not present the night of the shooting. Mack's defense argued Jones was not to be believed and that Jones and Braddy intentionally lied to blame appellant and Mack for the murder. The jury was unable to return a verdict, and the court ordered a mistrial. After the mistrial, Mack pled guilty to second-degree murder. *See United States v. Mack*, 2000-FEL-5243 (D.C. Super. Ct. Jan. 8, 2010).

## Appellant's Second § 23-110 Evidentiary Hearing

On March 21, 2014, appellant filed a second § 23-110 motion presenting two new ineffective assistance of counsel ("IAC") claims, a claim of actual

---

[3] We reversed Mack's conviction finding that the trial court erred in redacting an exculpatory portion of Mack's statement introduced by the government. *Andrews I*, 922 A.2d at 458-64.

innocence,[4] and a *Brady* claim. Judge Ronna L. Beck held four evidentiary hearings from December 2014 through February 2015.

At the hearing, Jenifer Wicks, appellant's trial counsel, testified that she worked to develop Braddy as an alternate perpetrator but decided against calling him as a witness because he refused to speak with the defense and she did not possess his grand jury testimony. She testified that statements about Rivers tracking Braddy down and threatening him made Braddy a more credible alternate perpetrator. Had the government disclosed his statements, she would have called Braddy as a defense witness. Wicks further testified that appellant admitted to her that he was one of the two people who shot Rivers.

On May 20, 2015, the trial court denied all of appellant's claims in a comprehensive order issued from the bench. In regards to appellant's *Brady* claim, the trial court found Braddy's grand jury testimony and video statements both favorable to the defense and suppressed, satisfying the first two prongs of *Brady*.[5]

---

[4] D.C. Code § 22-4131 (2013 Repl.).

[5] The trial court identified five classes of impeachment and exculpatory evidence: (1) Braddy contradicts Jones's presence at his house the night of the shooting in several respects; (2) Jones's and Braddy's accounts of appellant's alleged confession differed; (3) Braddy contradicts Jones's presence at the

(continued . . .)

However, the trial court found the statements immaterial. In doing so, the trial court expressed significant skepticism that Wicks would have called Braddy to testify at appellant's trial. The trial court found that Wicks already knew that Braddy contradicted Jones's presence at his house the night of the shooting, although it was only later that she learned that Braddy had very serious harmful testimony to add to the government's case.[6] Additionally, Wicks was still able to elicit contradictions in Jones's testimony through the testimony of James Braddy without David Braddy. The trial court then noted "[w]hether Wicks would have called Braddy or not the burden is on the defense to establish that if the *Brady* information had been disclosed it is reasonably probable that the trial would have had a different result. No such conclusion can be reached in this case."

The trial court also rejected any implication from Mack's mistrial, where Braddy testified for the defense, because Braddy did not have comparably

_____

(. . . continued)
fireworks incident; (4) Braddy's account of the fireworks incident also differed from Jones's; and (5) Jones testified that Braddy said he wanted to kill Rivers, but Braddy never testifies to wanting to kill Rivers.

[6] The trial court identified six harmful facts: (1) Braddy's testimony that his father told him that a person whom he saw running from the scene of the shooting looked like appellant; (2) appellant's confession to Braddy; (3) appellant requested Braddy hold onto one of the murder weapons; (4) Braddy saw appellant with the murder weapon all the time; (5) appellant regularly drove the Cadillac; and (6) appellant and Mack hung out all the time.

incriminating testimony regarding Mack as he did of appellant. The trial court held that "under the circumstances, no one can honestly say that it is reasonably probable that the trial would have had a different result given the double-edge sword represented by Braddy's testimony."

## II.

Appellant alleges two constitutional violations on appeal: (1) a *Brady* violation associated with the government's suppression of David Braddy's statements, which the trial court found immaterial, and (2) a Sixth Amendment right to the effective assistance of counsel resulting from appellant's conflict of interest with two potential alternate perpetrators.

## III.

The government's obligation to disclose material evidence favorable to the accused arises from the Due Process Clause's purpose of preventing miscarriages of justice. *See Brady*, 373 U.S. at 87. It is, however, the appellant who shoulders the burden of proving the three prongs of a *Brady* violation. *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011). An appellant must show that evidence in

question (1) "is favorable to the accused";[7] (2) "was possessed and suppressed by the government, either willfully or inadvertently;" and (3) is material to guilt or punishment. *Vaughn v. United States*, 93 A.3d 1237, 1254 (D.C. 2014) (citation and internal quotation marks omitted).

Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Miller v. United States*, 14 A.3d 1094, 1115 (D.C. 2011) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Mackabee*, 29 A.3d at 959 (quoting *Bagley*, 473 U.S. at 682). It is a fairness inquiry of the ultimate verdict that courts must address. The Supreme Court has clarified that materiality is not a "sufficiency of [the] evidence test." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, a defendant demonstrates a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435 (footnote omitted). Materiality is assessed by the cumulative effect of all suppressed evidence favorable to the defense, not item-by-item. *Id.* at 436.

---

[7] Favorability includes exculpatory and impeachment evidence. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

Suppressed evidence may be evaluated for its tendency and force item-by-item, but only the cumulative effect is evaluated for the purposes of materiality. *Id*. at 436 n.10.

Here, the trial court's analysis of appellant's *Brady* claim proceeded as follows: (1) the court reviewed the *Brady* disclosures made by the government; (2) it determined that the government suppressed favorable evidence; (3) it gave five examples of favorable suppressed evidence; (4) it then expressed significant skepticism about whether appellant's trial counsel would have used the suppressed statements in appellant's defense; (5) it gave six examples of unfavorable statements; and finally (6) the court concluded that due to the "double-edge sword" represented by the suppressed statements there was no reasonable probability that the trial would have resulted in a different outcome. This review, however, is improper as step four is inconsistent with the *Brady* materiality analysis. Whether a trial attorney would have actually used suppressed *Brady* evidence or whether the defendant could demonstrate actual use is irrelevant once evidence is found to be favorable and suppressed. Thus, such a consideration was erroneous.

In its brief, the government supports the trial court's unique *Brady* analysis

by citing to *Mackabee* and *Cotton v. United States*, 388 A.2d 865 (D.C. 1978).[8]

We fail to see how either of these cases supports the trial court's analysis here. *Mackabee*, for instance, involved the late disclosure—one week prior to trial—of a witness who failed to identify Mackabee from a photograph array, but instead, identified two other individuals whom the witness believed looked like the shooter.[9] 29 A.3d at 956-57. Mackabee argued the untimely disclosure cost him the opportunity to present the witness's "exculpatory testimony" at trial; we disagreed. *Id.* at 962. Mackabee's claim rested on the mere *possibility* that his defense might have located the witness, might have located the two men identified as looking like the shooter, and might have uncovered information to undermine

---

[8]    Specifically, the government argues "[e]vidence that information . . . would have had some effect on the proceeding . . . is a necessary factual predicate to the larger question of whether cognizable prejudice 'ensued' from the government's failure to disclose the information." Where a defendant "failed to show that disclosure would have had *any* effect, the question of cognizable prejudice simply does not arise." The government avers that, even if appellant's trial attorney possessed Braddy's statements, she never would have risked calling him to testify or using his statements at trial, and as such, appellant did not demonstrate that the suppression had any effect on his trial.

[9]    Mackabee also appealed the late disclosure of a videotaped police interview of an eyewitness's account to a murder, who gave an exculpatory description of the perpetrator. *Mackabee*, 29 A.3d at 956-57. The defendant argued the late disclosure of the videotaped interview amounted to a *Brady* violation because his defense lacked the opportunity to use the evidence effectively at trial. *Id.* at 958. The court disagreed, finding his counsel knew of the witness a year prior to trial, his counsel did in fact make effective use of the videotape evidence at trial, and the defendant did not advance, given the record, how his counsel could have used its contents any more effectively at trial. *Id.* at 959-60.

the government theory that Mackabee was the assailant. *Id.* This mere *possibility*, the court held, was not shown to be a reasonable *probability* of a different result had the disclosure occurred earlier. *Id.* at 964. *Mackabee* appropriately applies the *Kyles* materiality test to entirely speculative claims. *Id.* at 964-65 ("[T]he evidence that appellant was the shooter was strong (if not overwhelming), and the matters discussed above do not undermine our confidence in the outcome of appellant's trial."). The court never demanded Mackabee prove the suppressed evidence would have been used at trial; rather, it dismissed the remote possibility that unknown favorable evidence could have been discovered had timely disclosure occurred. Here, the trial court permissibly recognized the benefits and potential disadvantages of Braddy's suppressed statements. The trial court's materiality analysis, however, should have then appropriately proceeded to consideration of that evidence in light of the entire record, without speculation as to defense counsel's actual use of that evidence.[10] Indeed, in a usual *Brady* setting, there will be no testimony from trial counsel relative to use of the suppressed evidence and the trial court will proceed directly to the materiality issue.

    *Cotton* offers even less support because the *Brady* issue there involved

---

[10] While the trial court correctly acknowledged that the burden was on the defense to establish *Brady* materiality, the trial court's analysis appeared to be heavily influenced by her skepticism that the evidence would have been used.

favorability and not materiality.[11] Cotton argued, under *Brady*, that the trial court should have granted him a midtrial evidentiary hearing to explore the circumstances surrounding a witness's pretrial identification of Cotton (given conflicting trial testimony as to when a photographic identification occurred in relation to the robbery) and to determine the identity of the suspect the witness identified. *Cotton*, 388 A.2d at 872. The court rejected Cotton's argument because it was pure speculation that the witness identified someone other than Cotton[12] and the remote possibility of favorable evidence was insufficient. *Id*. at 873. Here, the lower court already concluded that the evidence suppressed by the government was favorable; *Cotton*, therefore, is inapplicable.

*Mackabee* and *Cotton* aside, the Supreme Court has said the purpose of *Brady* "is not to displace the adversary system as the primary means by which truth

---

[11] Only in the very last sentence of *Cotton* does the court address materiality. 388 A.2d at 873 ("The strength of the eyewitness identifications of appellant renders it unlikely that the questionable array was of sufficient materiality to establish a denial of appellant's due process rights.").

[12] The witness's identification was also based on sources independent of the disputed pretrial photographic array: she saw Cotton in the area where she lived prior to the robbery, she paid particular attention to him at the robbery because she thought he was attractive, and she made prompt identification of Cotton the day after the robbery. *Cotton*, 388 A.2d at 872. Additionally, there were two other eye witnesses and the prosecutor did not rely on the disputed photographic identification in closing arguments. *Id*.

is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675 (footnote omitted). A prosecutor's obligation is to disclose evidence favorable to the accused that would deprive the defendant of a fair trial if suppressed. *Id.* Compliance with this obligation, therefore, does not turn on speculation as to whether a defendant will use the disclosed evidence at trial. It is realistic that, in order to ensure a fair trial, *Brady* demands the timely disclosure of certain exculpatory or impeachment evidence, which may not ultimately fit with the defense's theory at trial, and for some other reason, may not be used at trial. Nonetheless, materiality requires that a trial judge examine the withheld evidence "in the context of the entire record, and determine in light of that examination" whether the withheld evidence puts the trial in a different light so as to undermine confidence in the verdict. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal citation omitted). It is the inculpatory evidence admitted at trial against which a court must consider the suppressed evidence in order to determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Miller*, 14 A.3d at 1115 (quoting *Bagley*, 473 U.S. at 682).[13]

---

[13] "[A] showing of materiality does not require demonstration . . . that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 U.S. at 434 (citation omitted). "A defendant need not demonstrate that after discounting the inculpatory evidence in

(continued . . .)

Though the trial court improperly considered the actual use or non-use of the suppressed evidence by defense counsel as part of its *Brady* analysis, we are satisfied that such error was harmless as there is no reasonable probability that had Braddy's grand jury testimony been disclosed, the result of the proceeding would have been different. The materiality question itself is a legal conclusion, in which we review *de novo*. *Turner v. United States*, 116 A.3d 894, 915 (D.C. 2015), *aff'd*, 137 S. Ct. 1885 (2017).

> Therefore, while we defer in this case to the motions judge's assessments of credibility, evaluations of the weight of the evidence and the inferences to be drawn therefrom, and findings of historical fact, so long as they have record support, we respect, but we do not accord comparable deference to, the judge's determination of the ultimate question of *Brady* materiality.

*Id.*

The trial court identified five areas of impeachment evidence relating to Jones's testimony that it considered to be favorable to the appellant, including (1) Braddy's contradiction of Jones's presence at his house on the night of the

---

(. . . continued)
light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434-35. Nor must a defendant demonstrate that "some of the inculpatory evidence should have been excluded." *Id*. at 435.

shooting, (2) differences in Braddy's and Jones's accounts of appellant's alleged confession, (3) Braddy's contradiction of Jones's presence at the fireworks incident with Rivers, (4) differences in Braddy's and Jones's explanations of the fireworks incident, and (5) Braddy's failure to testify that he wanted to kill Rivers, thereby contradicting Jones's testimony that Braddy had made those comments. With respect to the first, the record reveals that it was largely cumulative of other impeachment evidence appellant possessed and had used at trial. "Although impeaching information does not have a lesser standing in the context of the government's *Brady* disclosure obligations than affirmatively exculpatory information, it can be immaterial . . . if it is cumulative and the witness has already been impeached by the same kind of evidence." *Id.* at 922 (footnotes and internal quotation marks omitted). James Braddy, Braddy's father, testified that he, his wife, and his son were inside their home at the time of the shooting, watching television. *Andrews I*, 922 A.2d at 453. When James Braddy heard the gunshots, he went to his porch and did not see Jones anywhere in sight. *See id.* Moreover, he "had not seen Jones anywhere, either that night or on the previous day." *Id.* Had Braddy testified, he would have provided the same account as his father: that no one was present in the immediate area of his home when he and his father went outside to the porch to investigate the gunshots.

As to the remaining evidence, while Braddy's testimony would have contradicted Jones' testimony regarding certain key conversations and events that occurred both prior to and after the shooting, the evidence would largely have been a further impeachment of Jones's testimony. However, Jones's testimony had already been significantly impeached and his flaws as a witness exposed, so the question is one of degree. Here, had Braddy testified, appellant could have used Braddy's account of the fireworks incident and alleged confession to impeach Jones regarding what amounted to discrepancies in the details. However, his testimony also would have corroborated Jones's testimony that many of those incidents actually occurred. Most notably, Braddy's testimony would have corroborated Jones's testimony that appellant confessed to being involved in the shooting, that Rivers had been killed in his car, and that appellant was present when Braddy described the fireworks incident.

Considering this evidence in the context of the entire record, we are convinced that there is no reasonable probability that disclosing such information would have produced a different outcome at trial. The jury was well aware of the flaws in Jones's testimony and his overall credibility as a witness. *Andrews I*, 922 A.2d at 462. Thus, we have difficulty giving significant weight to any further undermining of Jones's credibility especially in light of the other evidence

presented at trial including the fact that two weeks after the shooting, MPD officers "recovered a Glock 17 semi-automatic pistol loaded with a single round of ammunition, as well as a clip containing 26 rounds" from a burgundy-colored Cadillac, *Id.* at 454; that a disinterested witness testified that she had signed a loan for the car on behalf of appellant; that MPD officers discovered a number of items linking appellant to the car; and an MPD firearms examiner testified that after testing, it was determined that fourteen of the sixteen cartridges recovered near River's body were fired from the Glock that was found in appellant's Cadillac.[14] *Id.*

We are even less persuaded that Braddy's grand jury testimony was material when we review it without separating the five favorable facts from the six the trial court deemed harmful to appellant's case. For example, Braddy's testimony would have provided further corroboration that appellant regularly drove the Cadillac where one of the murder weapons was recovered, that appellant frequently had that weapon in his possession, that appellant had confessed his role in the shooting to friends, and that he and Mack regularly spent time together. Moreover, Braddy's testimony would have included the fact that his father told him he had looked out

---

[14] *But see Gardner v. United States*, 140 A.3d 1172, 1177-78 (D.C. 2016); *Williams v. United States*, 130 A.3d 343, 351 (D.C. 2016) (Easterly, J. concurring).

of his second-story bedroom window and saw someone running from the scene of the shooting that resembled appellant. While Braddy's father subsequently provided a defense investigator with a statement contradicting his earlier identification of appellant as the person he saw running, had Braddy testified about his conversation with his father, there would have been evidence that a second, and arguably more credible, eyewitness inculpated appellant in the murder. In light of the "double-edged" nature of the evidence, when compared to the strong case against appellant, we are unpersuaded that had this evidence not been suppressed there is a reasonable probability that the outcome of appellant's trial would have been different.

Nor is our materiality assessment swayed by the jury's inability to reach a verdict in Mack's retrial. While Braddy testified in Mack's second trial, appellant fails to account for the fact that Braddy did not have remotely comparable incriminating testimony regarding Mack that he did of appellant. Braddy's grand jury testimony regarding Mack related to two areas: (1) appellant's alleged confession and, (2) Mack's possession of one of the murder weapons. As to the first, in the grand jury Braddy testified that after appellant confessed to the shooting, he had a conversation with Mack. Braddy explained he advised Mack of appellant's confession and Mack responded that appellant "told me the same

thing." Braddy further attested that Mack never told him that he was present at the time of the shooting or in a position to observe the shooting. Braddy also testified to his observations of Mack's possession of the murder weapons. He explained that he saw Mack "with the larger gun" once before the shooting but that he held the other handgun "most of the time." This testimony had far less an incriminating impact on Mack than Braddy's testimony regarding appellant.

Most notable, however, is the absence of Courtney Burley's testimony in Mack's retrial. At the original trial in 2002, Burley was one of the primary government witnesses implicating Mack, not appellant, in the shooting. Burley, a juvenile with an extensive delinquency record, testified that on the night of the shooting he encountered Mack in an alley near 23rd and C Streets, N.E. *Andrews I*, 922 A.2d at 453. As he approached Mack, who was in a concealed position, Mack told him "that it was about to get hot out there because of some gangster shit." *Id.* (internal quotation marks omitted). Burley called his brother to pick him up, who arrived approximately fifteen minutes later. *Id.* As the two drove away, Burley testified he heard the sound of gunshots. *Id.* On the day following the shooting, Burley again ran into Mack. *Id.* "In response to Burley's inquiry regarding what had occurred the previous night, Mack allegedly stated that he had been 'shooting.'" *Id.* At Mack's retrial, Burley completely recanted his original

trial testimony. The absence of this highly inculpatory testimony as well as the presence of Braddy's testimony, which did not have a remotely comparable incriminating effect on Mack as it did on appellant, leads us to conclude that Mack's retrial has no bearing on our materiality determination in appellant's case.

On the basis of our review of the record, we agree with the trial court that there is not a reasonable probability that the withheld evidence would have changed the outcome of appellant's trial. While we find the trial court's error was harmless after a proper *Brady* analysis, we remind the trial court that a proper materiality evaluation precludes it from considering the actual use of the suppressed evidence and substituting its judgment for that of defense counsel.

**IV.**

Appellant also raises two new IAC claims in his second § 23-110 motion that center on his trial counsel's alleged conflicts of interest from her simultaneous representation of Kevin Bellinger and acceptance of compensation from Octavian Brown, two possible alternative perpetrators. We find appellant's arguments unpersuasive and affirm the trial court's ruling.

At the § 23-110 evidentiary hearing, Jenifer Wicks was questioned regarding her alleged conflicts with Kevin Bellinger and Octavian Brown. At one of their first meetings, appellant informed Wicks that one of the handguns used in the Rivers murder was the same gun used by Bellinger in an earlier non-fatal shooting that occurred on May 26, 2000. Bellinger was eventually convicted in connection with that earlier shooting on April 5, 2002, and, within a few days, contacted Wicks requesting her representation during his sentencing and post-trial proceedings.[15] Wicks visited Bellinger in jail a few days later and they discussed possible representation and fee arrangements, but it wasn't until after appellant's trial had concluded in May of 2002 that Wicks formally agreed to represent Bellinger during his sentencing and post-conviction proceedings and entered her appearance.

Appellant alleges that when Wicks met with Bellinger an actual conflict of interest was created. He argues that Wicks used confidential information regarding the weapon, which she learned from appellant, "to file a motion on behalf of Bellinger seeking access to ballistics evidence from the Rivers murder" with the

---

[15] Bellinger had originally sought Wicks's representation in January 2001, but the inquiry was never pursued. Wicks did not remember that Bellinger had extended an offer to her when she agreed to represent appellant.

goal of presenting Mack as a third party perpetrator in Bellinger's case, but never sought the same ballistics evidence to present Bellinger as a third party perpetrator in his case as a possible defense.

In addition to the conflict with Bellinger, appellant alleges that Wicks possessed a second conflict with Octavian Brown because (1) Brown had agreed to pay Wicks an initial $5,000 retainer fee to represent appellant but still owed $1,500 by the time of trial and (2) Wicks was also representing Brown in two unrelated traffic cases.[16] Appellant argues that the representation created a conflict because some of the evidence in his case alluded to a connection between Brown and the Rivers murder.[17] However, Wicks testified that her contacts with Brown did not negatively affect her representation of appellant. She further testified that she made it clear to appellant that her duty was to him and not to those paying her fee but also acknowledged that she never discussed the possibility that appellant and Brown could have had adverse interests.

---

[16] The first traffic case was dismissed in January 2002, four months before appellant's 2002 trial, and the second traffic case was dismissed the day after Brown retained Wicks. Neither matter was pending when appellant went to trial.

[17] Police found a hotel receipt in Brown's name during the search of the Cadillac, and Brown reportedly drove the vehicle two or three times. Wicks also elicited testimony at appellant's trial that Brown was seen driving the Cadillac.

The trial court rejected both IAC claims. It found that Wicks and Bellinger lacked an attorney-client relationship until after appellant's trial and credited Wicks's testimony that she held nothing back out of loyalty to Bellinger. The trial court further determined that Bellinger was not a sustainable third party perpetrator because there was no evidence discovered that, despite what the trial court considered best efforts by Wicks and her investigator, put Bellinger near the scene of the murder during the relevant times. Similarly, the trial court rejected appellant's claim of a conflict due to the fiduciary relationship between Wicks and Brown because appellant's retainer agreement with Wicks clearly set forth her duty of loyalty to appellant, notwithstanding any fee payments by Brown. Again crediting Wicks's testimony, the trial court found that the payment arrangement had no impact on her trial strategy because, like Bellinger, there was no evidence that Brown was present during the day and night in question.[18]

## A.

"Our review of the trial court's determination of whether a conflict of

---

[18] The trial court explained, "[t]here is no evidence that Wicks failed to do anything because of her relationships with Bellinger and Brown" and "if [Wicks] had had more compelling evidence against either or both of them she would have used it."

interest exists is a deferential one, presenting a mixed question of law and fact." *Alston v. United States*, 838 A.2d 320, 324 (D.C. 2003) (citation and internal quotation marks omitted). Review of legal conclusions is *de novo*, but the trial judge's factual determinations are accepted, unless unsupported by the evidence. *Id.*

When claiming ineffective assistance of counsel, a defendant must establish that his counsel's performance was deficient and that the deficiency resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In cases where counsel is burdened by an actual conflict of interest, there is a presumption of prejudice. *Id*. at 692; *see also* (*Jermaine*) *Thomas v. United States*, 685 A.2d 745, 751 (D.C. 1996). This is not, however, a *per se* rule, and prejudice is only presumed "if the [appellant] demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980)). The mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350.

We have recognized that an attorney has an actual conflict of interest when "the attorney's and the [client's] interests diverge with respect to a material factual

or legal issue or to a course of action." *Veney v. United States*, 738 A.2d 1185, 1192-93 (D.C. 1999) (recognizing actual conflict of interest where defense attorney is required to make choices advancing one client's interest to the detriment of another's) (citation and internal quotation marks omitted). *See also Douglas v. United States*, 488 A.2d 121, 138 (D.C. 1985) (finding a conflict where the defendant complained of his lawyer's performance to Disciplinary Counsel, which initiated an investigation, and the lawyer thereby acquired a personal, potentially conflicting interest in how the defense would be conducted). While "[c]onflicts of interest can arise both in cases of simultaneous and successive representation," "[r]epresenting more than one person charged in the same criminal transaction . . . does not automatically create a conflict of interest." *Veney*, 738 A.2d at 1193. Thus, "a conflict alone is not enough to permit reversal of a conviction on appeal"; "the conflict must [also] be shown to have adversely affected the trial attorney's performance." *Malede v. United States*, 767 A.2d 267, 272 (D.C. 2001) (rejecting automatic reversal where an attorney expressed hostility to his client, calling him a "malevolent little man"). Likewise, "[a]n alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Derrington v. United States*, 681 A.2d 1126, 1133 (D.C. 1996) (quoting *Fitzgerald v. United States*, 530 A.2d 1129, 1138 (D.C. 1987)).

**B.**

Appellant argues that, but/for Wicks's conflict of interest, she would have presented Bellinger as a potential third party perpetrator in his trial. Even assuming, *arguendo*, appellant met his burden of establishing that an attorney-client relationship existed between Wicks and Bellinger,[19] appellant has failed to demonstrate how a possible conflict could have adversely affected Wicks's performance. *See Malede*, 767 A.2d at 272. The trial court found that, even if Wicks presented Bellinger as a third party perpetrator, he would not be charged

---

[19] Appellant argues that Wicks owed a duty of loyalty to Bellinger after meeting with him in prison and a third party agreed to pay his fee. While we have recognized that an attorney-client relationship may be established before a contract exists or before the payment of any fees, the parties must still "manifest an intention to create the attorney/client relationship," either "explicitly or by their conduct." *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996). Moreover, "[r]epresenting more than one person charged in the same criminal transaction. . . does not automatically create a conflict of interest." *Veney*, 738 A.2d at 1193. On these facts, we cannot say definitively whether Wicks and Bellinger, explicitly or by their conduct, manifested an intention to establish an attorney-client relationship. *See In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) ("[W]e consider the totality of the circumstances to determine whether an attorney-client relationship exists."). However, we do not need to address this question further because Wicks could not have presented Bellinger as a third party perpetrator, and as such, appellant fails to demonstrate how Wicks's performance was adversely affected.

simply because Wicks accused him of committing a criminal act,[20] and Wicks could not place Bellinger on the scene during the relevant times.[21] The lack of evidence linking Bellinger to the murder is significant because appellant's argument of adverse performance relies entirely on the fact that Wicks did not present Bellinger as a third party perpetrator. Accordingly, appellant's argument must fail if we determine that there was insufficient evidence in the record to support appellant's third party perpetrator defense. *See Derrington*, 681 A.2d at 1133.

Evidence offered to show that someone other than the defendant committed the alleged crime is commonly known as *Winfield* evidence. *See Winfield v.*

---

[20] The trial court is correct on this point; though, it bears less weight in our analysis. The government already possessed evidence that a number of different individuals had access to the Cadillac and murder weapons. The government, at its sole discretion, charged those individuals, whom it believed it could prove guilt beyond a reasonable doubt. Unless Wicks possessed additional evidence linking Bellinger to the Rivers murder, Bellinger would not have been charged simply because she accused him. The absence of any evidence placing Bellinger on the scene during relevant times strengthens this observation. Appellant's reliance on *United States v. Nicholson*, 475 F.3d 241 (4th Cir. 2007), is therefore misplaced, and additionally, we find the unique facts in *Nicholson* distinguishable and unpersuasive.

[21] As the trial court explained, "[t]here was no evidence [Bellinger] was around when Braddy was describing the fireworks incident to Mack and Andrews that provided the . . . motive for . . . this murder. There was no evidence he was in the neighborhood near the time of the shooting."

*United States*, 676 A.2d 1 (D.C. 1996) (en banc). For such evidence to be admissible, "there must be proof of facts or circumstances which tend to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense." *Winfield*, 676 A.2d at 4 (citation and internal quotation marks omitted) (emphasis added). "Conversely, the trial court should exclude *Winfield* evidence if it is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt." *Turner*, 116 A.3d at 917 (quoting (*Todd*) *Thomas v. United States*, 59 A.3d 1252, 1264 (D.C. 2013)) (internal quotation marks omitted). This is not an impotent bar to admissibility. Even in circumstances where other individuals had stronger motives to murder the victim than the accused, there must still be proof that the other individual had the practical opportunity to commit the crime. *See Turner*, 116 A.3d at 916; *Winfield*, 676 A.2d at 4. The trial court has the discretion to exclude such evidence if "its marginal probative value is substantially outweighed by the risk of unfair prejudice, confusion of the jury, or similar considerations." *Turner*, 116 A.3d at 917 (footnote omitted).

Here, we are unpersuaded by appellant's arguments that Bellinger was a viable third party perpetrator. Appellant's entire argument can be summarized as "guilt by association." It relies exclusively on evidence that Bellinger had access

to the murder weapon linked to Mack and to the Cadillac—as did many others in the neighborhood—in order to assert a "plausible defense strategy," while wholly ignoring the dearth of evidence placing Bellinger at the scene during the fireworks incident or in the neighborhood near the time of the shooting. Further, the record clearly indicates the scope of Wicks's investigative efforts and the information she obtained. Wicks testified that she and her investigator looked for any evidence linking Bellinger to the scene of the murder. They interviewed Bellinger himself, who provided an alibi that he was in Maryland during the relevant time period. They interviewed mutual friends of Bellinger and appellant to either confirm or deny Bellinger's absence. Wicks was unable to uncover any evidence that Bellinger was in the neighborhood the evening of the shooting or during the early morning hours. When asked why she did not present Bellinger as an alternative perpetrator, Wicks testified that she was unable to establish that Bellinger had the means, motive, or opportunity to murder Rivers.[22] So, even though there was evidence that linked Bellinger to one of the murder weapons six weeks earlier, there was no evidence that connected him to the weapon on the day of the murder, no evidence that connected him to the Cadillac other than the fact that it was

---

[22] Wicks also testified that the Public Defender Service, who was representing co-defendant Mack at the time, was investigating whether Bellinger was present the night of the shooting because of his connection with the gun linked to Mack. There is no indication that the Public Defender Service uncovered any additional evidence linking Bellinger to the Rivers murder.

shared by a number of people in the neighborhood, and no evidence that indicated he had any motive to kill Rivers.

There is simply no reasonable possibility that Bellinger was involved in the River's murder or that he had a practical opportunity to be involved. Certainly, he previously possessed one of the murder weapons used in this heinous crime, but that fact alone is insufficient under *Winfield* and its progeny to offer Bellinger as a viable third party perpetrator. For these reasons, appellant has failed to sustain his IAC of a possible conflict from Wicks's connection to Bellinger, and we affirm the trial court's ruling in this regard.

## C.

Appellant makes a similar IAC claim with regard to Octavian Brown, a third party who paid for appellant's legal services. In this instance, appellant contends that Wicks also failed to present Brown as a third party perpetrator because he paid appellant's legal fees and still owed Wicks $1,500 when appellant's case went to trial. Again however, the only evidence linking Brown to the Rivers murder was his shared access to the Cadillac and the murder weapon contained therein.

The trial court once again rejected appellant's argument, finding that Wicks "did not have an actual conflict of interest, and her trial strategy was in no way impacted by any conflict of interest." In coming to that determination, the trial court credited Wicks's testimony that the retainer agreement signed by both Brown and appellant clearly indicated that Wicks's loyalty was to appellant, notwithstanding Brown's payments,[23] and that Brown's payments had no impact on her trial strategy because of the insufficient evidence linking Brown to the Rivers murder.[24] After a four-day evidentiary hearing, the trial court recognized that Wicks's most sound trial strategy was to have the jury believe Mack and Braddy murdered Rivers, but also to establish that the police did an inadequate investigation and that other people in the neighborhood had access to the murder weapons.

We agree with the trial court that there was no conflict of interest due to Brown's payment of appellant's legal fees or due to Wicks's representation of

---

[23] Appellant argues that any waiver of a conflict was invalid because the original trial court never conducted the requisite on-the-record waiver colloquy. *See Pinkney v. United States*, 851 A.2d 479, 488-89 (D.C. 2004). However, the § 23-110 trial court found, and we agree, that there was no conflict of interest, and as such, no requirement that the original court conduct a colloquy.

[24] Wicks had, in fact, elicited testimony during the cross-examination of a government witness linking Brown to the Cadillac.

Brown in two unrelated traffic offenses. Simultaneous representation and third party fee agreements do not automatically equate a conflict of interest. *See Malede*, 767 A.2d at 272; *Veney*, 738 A.2d at 1192-93. Nor are we persuaded by appellant's contention that a small outstanding debt would cause a professional attorney to outright forgo a plausible defense strategy for his or her client, whom was facing considerable incarceration for first-degree murder. Finally, for the same reasons discussed above, we are unconvinced that Wicks would have been able to present Brown as a viable third party perpetrator because, on these facts, there was even less evidence linking Brown to the murder weapons and the scene of the shooting than there was for Bellinger. As such, Wicks's performance was not adversely affected nor was appellant deprived of a plausible defense strategy. *See Derrington*, 681 A.2d at 1133.


Because appellant has failed to meet his burden in demonstrating an actual conflict of interest that adversely affected his counsel's performance, we affirm the trial court's ruling that he was not deprived of the effective assistance of counsel.


*So ordered.*