*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0902

EL HADJI A. TOURE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2017-CF1-005232)

(Hon. Juliet J. McKenna, Trial Judge)

(Argued February 20, 2025                                   Decided May 29, 2025)

*Sean Belanger*, with whom *Steven D. Gordon* was on the briefs, for appellant. After the case was argued, this court granted the motion of *Sean Belanger* to withdraw as co-counsel of record.

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb* and *Jeffrey S. Nestler*, Assistant United States Attorneys, were on the brief, for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and RUIZ, *Senior Judge*.

SHANKER, *Associate Judge*: Following a jury trial, appellant El Hadji A. Toure was convicted in Superior Court of multiple offenses in connection with the 2017 rape and murder of victim C.M. in Washington, D.C. Mr. Toure appealed and, while

the appeal was pending, filed a motion for a new trial in the trial court, alleging that the government violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court denied the new-trial motion, and Mr. Toure's convictions and that denial are now before this court on appeal, with Mr. Toure asserting two claims (as well as an unopposed merger claim).

First, Mr. Toure contends that the trial court erred in concluding, after assuming that the government suppressed favorable evidence contrary to *Brady*, that a new trial was not warranted because there was no reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. We find no error in that conclusion.

Second, Mr. Toure argues that he was denied his constitutional confrontation and due process rights when, during trial, the prosecutor elicited from a testifying Metropolitan Police Department (MPD) sergeant information that the prosecutor had provided to the sergeant the night before he testified and the trial court then denied Mr. Toure's request to call the prosecutor as a witness. We conclude that the prosecutor's elicitation of the testimony violated Mr. Toure's confrontation and due process rights and assume without deciding that the trial court's response was insufficient to cure the violations, but we hold that any error was harmless beyond a reasonable doubt.

Accordingly, we affirm Mr. Toure's convictions, affirm the denial of a new trial, and remand for the limited purpose of merging Mr. Toure's convictions and resentencing as necessary.

## I.     Background

### A.     Factual Background

The evidence at trial included the following.  C.M. was an artist living in North Carolina who had come to Washington, D.C., in March 2017 to help install an exhibition at the Corcoran Gallery.  While in D.C., C.M. was staying in a basement apartment at 631 14th Street, NE.  At 10:12 a.m. on the morning she planned to return to North Carolina—Monday, March 20, 2017—video from a Metro bus captured C.M. packing her blue Prius in the 600 block of 14th Street, NE. The next day, after C.M. failed to respond to numerous text messages and e-mails, two of her colleagues went to the apartment where she had been staying.  The colleagues were ultimately able to enter the apartment, where they found C.M.'s body on the bedroom floor.

C.M.'s body was lying face-down, partially undressed, bound with clothing and sheets.  Her neck had been cut at least thirty-nine times, and it had a "large gaping wound" on the right side where both her carotid artery and jugular vein had

been severed.  C.M. had stab wounds on her back and side and defensive wounds on her hand.  It appeared that C.M. had been choked.  Her ankles and knees had been bound with clothing and a sheet, and her arms had been tied behind her back with additional clothing and a second sheet.  The bindings were "very tight."  C.M. had two abrasions "relatively far up inside of her vagina" that were caused by a "digit, another body part, [or an] object."  Sperm was inside C.M.'s vagina.

Video from a nearby house showed C.M.'s car being driven away at 12:57 p.m. on March 20.  At approximately 2:45 p.m. that afternoon, someone used C.M.'s credit card at an ATM in College Park, Maryland, to obtain a $200 cash advance.  Early that evening, someone used C.M.'s credit and debit cards at an ATM inside a 7-Eleven in Beltsville, Maryland, to attempt withdrawals.  Soon thereafter, someone used C.M.'s debit card at an ATM in an Exxon station in Beltsville to withdraw $200 from her checking account.

At approximately 3:00 a.m. on March 21, someone withdrew $400 using an ATM at a deli in Elkridge, Maryland.  Early the next morning, someone withdrew $500 using an ATM at a Gulf gas station in Laurel, Maryland.  At 7:55 p.m. on March 23, someone withdrew $500 using an ATM at Presidential Bank in Rosslyn, Virginia.  And at approximately 1:00 a.m. on March 24, someone withdrew $500

using an ATM at Navy Federal Credit Union in Laurel.  In conducting these transactions, the person never entered the wrong PIN.

Images from the ATMs and a tip led to the identification of Mr. Toure and his arrest on March 27.  That day, an MPD detective executed a search warrant at Mr. Toure's father's house in Laurel.  The detective showed Mr. Toure's stepmother a still shot from a video of the person using C.M.'s debit card on March 24.  Mr. Toure's stepmother identified the man as Mr. Toure.  Mr. Toure was wearing a black backpack in the photo, which, according to the stepmother, he carried "a lot."

In January 2017, Mr. Toure was living in his father's basement but the two had an argument and Mr. Toure left without his belongings.  After he left his father's house until March 18, Mr. Toure mostly stayed in a shelter in D.C. run by Catholic Charities.  The nights of March 18 and 19, Mr. Toure stayed in a separate emergency shelter in D.C. also run by Catholic Charities.  Catholic Charities had no record of Mr. Toure staying in any of its shelters after the night of March 19.  On March 21, Mr. Toure checked into a Motel 6 in Laurel, paying $117.50 in cash for a two-night stay.  On March 24, Mr. Toure paid $1,328 in cash for a used Ford Taurus and insurance.

When Mr. Toure was arrested on March 27, officers searched him and found, among other things, a Metro SmarTrip card.  Using a record of Mr. Toure's

SmarTrip card transactions, the government obtained videos of him using various Metro buses and stations in the days surrounding C.M.'s murder. As noted, at 10:12 a.m. on March 20, C.M. was packing her car in the 600 block of 14th Street, NE. Video captured Mr. Toure walking up that block in the direction of C.M.'s apartment three minutes later. Mr. Toure was carrying a black backpack. Mr. Toure crossed from the west side of the street to the east side, where C.M.'s apartment and car were located, and then stopped and stared in her direction for over a minute. Mr. Toure then continued walking north on 14th Street toward C.M.

Numerous videos obtained by the government also showed that the individual who used C.M.'s credit and debit cards, apparently with her PIN, seven times soon after the murder and over the course of several days thereafter was Mr. Toure. At trial, after watching the video from the deli on March 21, Mr. Toure's father testified that "[i]t looks like El Hadji."

When Mr. Toure was arrested, his Taurus was seized. There was a switchblade knife in the driver's side door of Mr. Toure's car and a pair of gloves in the center console. Mr. Toure's black backpack was in the trunk near another pair of gloves. There was a third pair of gloves inside Mr. Toure's backpack. After inspecting the knife found in Mr. Toure's car, the medical examiner opined that "the wounds that [she] found on [C.M.]'s body [were] consistent with wounds that would

have been caused by th[e] knife." The medical examiner also opined that the "large gaping wound" on C.M.'s neck was "comprised of more than one cutting event." That wound was on the right side of C.M.'s neck; Mr. Toure wrote with his left hand.

Mr. Toure's DNA was found in multiple locations at the crime scene. C.M.'s ankles had been bound with, among other things, a pair of black leggings. There was a semen stain on a piece of the leggings, and Mr. Toure was the major contributor to the DNA found in the semen. There was sperm inside C.M.'s vagina; the mixture of DNA in the sperm sample included Mr. Toure's. Testing of a swab from C.M.'s external genitalia likewise resulted in a mixture that included Mr. Toure's DNA. Mr. Toure's DNA was also in the mixtures on the swabs taken from C.M.'s perianal buttock area and thighs. In addition, a chemical test of Mr. Toure's backpack gave a positive reaction inside a pocket for material consistent with human blood. DNA testing of that area resulted in a mixture that included C.M.'s DNA.

## B.    Procedural History

In March 2019, a jury convicted Mr. Toure of the following offenses and found various aggravating circumstances, including that the murder was especially heinous, atrocious, or cruel, *see* D.C. Code § 22-2104.01(b)(4):

- First-degree premeditated murder while armed and first-degree felony murder while armed, D.C. Code §§ 22-2101, -4502;

- First-degree sexual abuse while armed, D.C. Code §§ 22-3002(a)(1), -4502;

- Kidnapping while armed, D.C. Code §§ 22-2001, -4502;

- First-degree burglary while armed, D.C. Code §§ 22-801(a), -4502;

- Robbery while armed, D.C. Code §§ 22-2801, -4502;

- First-degree theft, D.C. Code §§ 22-3211, -3212(a);

- Unlawful use of a vehicle, D.C. Code § 22-3215;

- Credit card fraud, D.C. Code § 22-3223(b)(1), (d)(2); and

- First-degree identity theft, D.C. Code §§ 22-3227.01, -3227.02(2)(A), -3227.03(a).

The trial court sentenced Mr. Toure to life in prison without release.

Mr. Toure timely appealed.  In March 2020, while his appeal was pending, Mr. Toure filed a motion for a new trial, which he twice supplemented.  The trial court denied Mr. Toure's motion in January 2024.

## II.    Analysis

Mr. Toure contends that (1) the trial court erred in finding no prejudice under *Brady v. Maryland* and (2) the trial court erred, in violation of his confrontation and

due process rights, in addressing the incident involving the prosecutor's elicitation of testimony by the MPD sergeant. We address each claim in turn.[1]

### A. Suppression of Favorable Evidence

Mr. Toure challenges the trial court's denial of his motion for a new trial, which was based on the untimely disclosure by the government of potential impeachment evidence relating to several government witnesses from the District of Columbia Department of Forensic Sciences (DFS).

A defendant asserting a violation of *Brady v. Maryland* "must show that [the] evidence in question (1) is favorable to the accused; (2) was possessed and suppressed by the government, either willfully or inadvertently; and (3) is material to guilt or punishment." *Andrews v. United States*, 179 A.3d 279, 286-87 (D.C. 2018), modified (Mar. 15, 2018) (internal quotation marks and footnote omitted). Like the trial court and the government on appeal, we assume (and there really is little question) that the government suppressed favorable evidence, but we agree with the trial court that the evidence was not material to guilt, that is, that there was

---

[1] As noted, Mr. Toure also argues that he cannot, consistent with the Double Jeopardy Clause, be convicted of and sentenced for one count of premeditated murder and four counts of felony murder based on a single killing, and thus four of those convictions and sentences must be vacated; he also contends that if one of the felony murder convictions is preserved, then the conviction and sentence for the underlying felony must be vacated. The government agrees, as do we.

no reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.

### 1.      Additional Background

DFS employees handled, processed, and tested much of the DNA evidence in this case. As part of its quality correction policies and procedures, DFS issues quality corrective action reports (QCARs) when quality corrective action is needed after an error in forensic practices occurs. Before trial, the defense asked the government to produce all QCARs from DFS relating to "anybody involved in the handling or testing of the evidence in this case." Litigation relating to the defense's request ensued, but it suffices for purposes of this appeal to say that ultimately the trial court ordered DFS to produce QCARs that named any of the "individuals who [we]re involved in the evidence collection, maintenance, and testing in this case."

Before trial, DFS provided to the court, the defense, and the prosecutors fifteen QCARs relating to eight DFS witnesses; none of the QCARs related to the witnesses' work in this case. At trial, the government called thirteen witnesses from DFS. The defense did not question any of the DFS witnesses about the QCARs.

A separate, private laboratory named Signature Science also conducted DNA testing in this case. C.M.'s body was recovered from the crime scene by a forensic

investigator who transported it to the Office of the Chief Medical Examiner. An assistant medical examiner removed the bindings that had been used to tie C.M.'s extremities. Two DFS employees packaged, sealed, and tagged the bindings with a bar code and then sent them to Signature Science on March 22, 2017. When Signature Science received the bindings, there was no evidence of tampering or contamination. Nicole Kaye, an expert from Signature Science, performed DNA testing on the bindings and other evidence. She found semen on a piece of the black leggings that had been used to tie C.M.'s ankles. Mr. Toure was the major contributor to the DNA found in the semen. The government had timely disclosed one QCAR related to one of the two DFS employees who processed and sent the bindings to Signature Science and had timely represented that the other employee had no responsive QCARs. The defense did not question the DFS employee about her QCAR when she testified.

After trial, the government learned that DFS had failed to turn over thirteen QCARs, three reprimands, and two suspensions related to five DFS witnesses who had testified. None of the documents directly involved the witnesses' work in this case. The government provided the QCARs to the defense and the defense moved for a new trial.

The trial court denied the motion. The court noted that the government did not dispute that it had suppressed favorable evidence, and it agreed with that concession, as the court had ordered disclosure of the QCARs and the information "could have been used by the defense to impeach [the DFS witnesses'] testimony and argue to the jury that the accuracy of their work in connection with the collection and analysis of the forensic evidence in this case should be questioned." The court stated that it would have permitted the defense to cross-examine the DFS employees about the QCARs because the QCARs were "indisputably relevant" to the witnesses' competence and motivation to curry favor with supervisors or prosecutors. The court also assumed that "the cumulative impact of the multiple disciplinary infractions may have caused defense counsel to make a different strategic decision and pursue this line of cross examination with the impacted DFS technicians during the course of the trial."

"Even accepting all of this, however," the trial court was "unable to find that the defense ha[d] established the third prong" of a *Brady* claim. First, the court observed that "none of the undisclosed Q-CARs or other personnel disciplinary materials directly impacted upon the evidence collection or forensic analysis conducted in this case or reflect any errors in the collection, processing, testing, and analysis in this particular case."

Second, with two exceptions, none of the QCARS related to the *types* of tasks the DFS employees performed in this case and the QCARS related to employees who played minor roles in the forensic work in this case. As to the two exceptions, one employee played a "major" role in the case but her QCARs "related to very minor incidents"; the other employee had committed serious infractions but had "minimal involvement" in the investigation of Mr. Toure.

Third, the court noted that the leggings were recovered by the medical examiner and tested by Signature Science, not DFS; and, while DFS employees packaged, sealed, and delivered the leggings, QCARs (or the lack thereof) for those employees had been timely disclosed. "Thus[,] other independent DNA analysis uncontaminated by DFS personnel actions conclusively links Mr. Toure to [C.M.'s] rape and murder, supporting the jury's ultimate verdict in this case."

Fourth, Mr. Toure could not establish prejudice from the untimely disclosures given "the other overwhelming evidence" against him. In this regard, the trial court observed that, "even if DFS'[s] work was to be completely discredited, other significant and compelling evidence establish[ed] Mr. Toure's guilt in the rape and murder."

Ultimately, the court concluded that "[t]here [was] no reasonable probability that had the evidence been disclosed, the result of the proceeding would have been

different," and the failure to timely disclose did not "undermine confidence in the jury's final verdict of guilt."

## 2.      Standard of Review

Whether a defendant has "established a violation of *Brady* is a mixed question of fact and law." *Turner v. United States*, 116 A.3d 894, 914 (D.C. 2015), *aff'd*, 582 U.S. 313 (2017). "In that circumstance, we review the trial court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard." *Id.* at 914-15 (quoting *Miller v. United States*, 14 A.3d 1094, 1120 (D.C. 2011)). "Materiality—defined as whether the government's failure to disclose exculpatory evidence undermines our confidence in the verdict—is, in the end, a legal conclusion." *Id.* at 915. "Therefore, while we defer in this case to the motions judge's assessments of credibility, evaluations of the weight of the evidence and the inferences to be drawn therefrom, and findings of historical fact, so long as they have record support, we respect, but we do not accord comparable deference to, the judge's determination of the ultimate question of *Brady* materiality. With due appreciation for the fact-bound nature of that ultimate question, we must review it *de novo* on appeal." *Id.*

### 3. Discussion

"Violation of due process under *Brady* occurs (i) 'when the prosecution fails to disclose, before or during trial, evidence favorable to the defense,' and (ii) 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different[.]'" *St. John v. United States*, 227 A.3d 141, 146 (D.C. 2020) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "'[N]on-disclosure of evidence affecting credibility' falls within the purview of the *Brady* rule." *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *see Andrews*, 179 A.3d at 287 n.7 ("Favorability includes exculpatory and impeachment evidence."). The government must disclose exculpatory evidence "in time for the defense to be able to use it effectively, not only in the presentation of its case, but also in its trial preparation," *Vaughn v. United States*, 93 A.3d 1237, 1257 (D.C. 2014) (quoting *Miller*, 14 A.3d at 1111); "'as soon as practicable' should be the approach," *id.* "Under *Brady*, evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Andrews*, 179 A.3d at 287 (quoting *Miller*, 14 A.3d at 1115). The defendant "shoulders the burden of proving the three prongs of a *Brady* violation." *Id.* at 286.

The QCARs, which could have been used for impeachment and were therefore exculpatory, were not disclosed until after trial. By suppressing this information, the government failed in its obligation to disclose exculpatory information in a timely manner. *See Vaughn*, 93 A.3d at 1257. We therefore assume, as the trial court did and the government does on appeal, that the government suppressed evidence favorable to the defense in the form of QCARs, reprimands, and suspensions relating to five DFS witnesses. We also assume (1) that Mr. Toure would have sought to use those QCARs to impeach the witnesses at issue, *see id.* ("Whether a trial attorney would have actually used suppressed *Brady* evidence or whether the defendant could demonstrate actual use is irrelevant once evidence is found to be favorable and suppressed."); (2) that the trial court would have permitted impeachment of the witnesses with the QCARs, as the court said it would have; and (3) that, armed with additional QCARs, Mr. Toure would have pursued a strategy of using the QCARs not only to impeach individual DFS witnesses but also to present a more general argument that DFS's forensic work could not be trusted.

We nonetheless agree with the trial court that there is no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Andrews*, 179 A.3d at 287 (quoting *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011)). "It is a fairness

inquiry of the ultimate verdict that courts must address." *Id.* "The Supreme Court has clarified that materiality is not a 'sufficiency of [the] evidence test.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "Rather, a defendant demonstrates a *Brady* violation 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles*, 514 U.S. at 435); *see Vaughn*, 93 A.3d at 1262. "Materiality is assessed by the cumulative effect of all suppressed evidence favorable to the defense, not item-by-item." *Andrews*, 179 A.3d at 287. "Suppressed evidence may be evaluated for its tendency and force item-by-item, but only the cumulative effect is evaluated for the purposes of materiality." *Id.* "It is the inculpatory evidence admitted at trial against which a court must consider the suppressed evidence" in the prejudice analysis. *Id.* at 289.

We think that the broadest possibility here is that the jury would have developed a wholesale skepticism about DFS's work, and we adopt the trial court's assumption that "the jury would have disregarded or discounted the DNA testing that was conducted by DFS entirely in this case." Our confidence in the outcome of the trial still is not undermined. For one thing, Mr. Toure's DNA was found in a semen stain on the leggings used to bind C.M.'s ankles. Those leggings were removed by an assistant medical examiner, and the independent laboratory Signature Science, not DFS, conducted the serology and DNA testing of the leggings. It is true

that DFS employees were involved with the leggings, but that involvement was limited to packaging, sealing, tagging, and sending the leggings, as opposed to any testing or analysis. We also find it significant that the leggings were packaged and sent to Signature Science several days before Mr. Toure was identified and arrested, making it highly unlikely (if not impossible) that any errors or even malfeasance in the handling of the leggings could have resulted in the placement of Mr. Toure's biological material on them. It would not, therefore, be reasonable to conclude that the QCAR evidence would have caused the jury to disregard the DNA evidence from the leggings, and that evidence was powerfully incriminating even standing alone.

But there was much more than the leggings. Video evidence captured Mr. Toure approaching C.M.'s apartment just before she was raped and murdered and then driving C.M.'s car and using her credit and debit cards soon after the rape and murder. Mr. Toure, moreover, apparently knew C.M.'s PIN, with the most reasonable inference being that he forced C.M. to reveal it before or while he attacked her. Suddenly after the rape and murder, Mr. Toure was in a substantially improved financial situation than he had been in before, with the evidence showing that he stayed in a hotel rather than shelters and bought a car with cash. C.M.'s wounds were consistent with wounds that could be caused by the knife found in Mr. Toure's car. And the most substantial wound C.M. suffered was on the right side of her neck; the evidence suggested that Mr. Toure was left-handed.

Mr. Toure argues that the QCARs were compelling and would have served to substantially undermine the testimony of the DFS witnesses. We are, however, assuming as much and are therefore assessing prejudice on the premise that the jury would have entirely discredited the DNA testing conducted by DFS. Mr. Toure also maintains that the DNA testing of the leggings by Signature Science would have been undermined by the QCARs because DFS employees handled the leggings, but he does not explain why a reasonable jury would have disregarded DNA testing conducted by a separate entity simply because DFS employees packaged and transmitted the object that was tested, and did so days before Mr. Toure had even been identified and located. Finally, Mr. Toure contends that the remaining evidence against him was merely circumstantial, but it is well established that "[c]ircumstantial evidence is not intrinsically inferior to direct evidence," *(Christopher) Smith v. United States*, 809 A.2d 1216, 1222 (D.C. 2002) (internal quotation marks omitted; alteration in original), and where circumstantial evidence is "powerful"—as it is here—it can undercut a claim of prejudice, *Williams v. United States*, 210 A.3d 734, 744 (D.C. 2019).

In sum, Mr. Toure failed to meet his burden of showing a reasonable probability that the outcome of the trial would have been different if the government had disclosed the QCARs at issue. We therefore affirm the trial court's denial of Mr. Toure's motion for a new trial.

## B.      Testimony by the MPD Sergeant

Mr. Toure's second argument relates to conduct by the prosecutor in preparing and then examining a witness.  We recognize that the prosecutor's conduct violated Mr. Toure's Sixth Amendment and due process rights and assume without deciding that the trial court erred in denying Mr. Toure's requested remedy.  We conclude, however, that any error was harmless beyond a reasonable doubt.

### 1.      Additional Background

During the investigation of C.M.'s rape and murder, law enforcement discovered that C.M. had a website, and that on that website was an art project titled "All of the Clothes" in which C.M. was photographed lying face down, naked, next to a pile of clothing.  Although the photograph did not show C.M. bound or with any stabbing wounds, it was "striking" to officers, presumably due to its similarity to the crime scene.[2]

At trial, during the direct examination of MPD Sergeant Keith Batton, who had supervised the squad investigating the crime, the government asked whether "detectives" took "any efforts to contact the domain, the web hosting service that

---

[2] The art project is not a part of the record on appeal, but the parties appear to agree on its general description, and undisputed trial testimony indicates that law enforcement thought the photograph bore a "striking" similarity to the crime scene.

hosted this web site," and Sergeant Batton answered, "They did." Sergeant Batton stated that the domain, Format.com, provided a number of mobile IP addresses that had viewed C.M.'s website. The government then asked Sergeant Batton whether "those mobile IP addresses [were] able to lead to any useful leads in terms of figuring out actual people who viewed the web site," and Sergeant Batton answered, "They were not."

After Sergeant Batton's direct testimony, the defense objected that the government had not disclosed that detectives had tried to figure out who had viewed C.M.'s website. Although the defense had received mobile IP addresses from Format.com in discovery, because the government had not disclosed more, the defense did not know what the addresses related to. The government responded that the grand jury had subpoenaed Format.com for IP addresses that accessed C.M.'s website and that the investigation into those addresses "didn't go anywhere."

The trial court allowed the defense to speak to Sergeant Batton and then to voir dire him outside of the trial prosecutors' presence (but with another government attorney present). Ultimately, it was revealed that, after seeing C.M.'s art project, and despite finding it "striking," Sergeant Batton did not "take any steps to obtain information related to" C.M.'s website, nor was Sergeant Batton aware of any other member of law enforcement having taken such steps. Rather, the night before

Sergeant Batton's testimony when the prosecutor was preparing him, the prosecutor told the sergeant that the grand jury (through the prosecutor, who runs the grand jury process) had issued a subpoena to Format.com for the IP addresses; prior to the prep session, the sergeant had no knowledge of any grand jury investigation into the website. The prosecutor also told Sergeant Batton that the IP addresses provided by Format.com in response to the subpoena were mobile IP addresses; Sergeant Batton would not have been able to determine that information himself. Sergeant Batton stated that his trial testimony that the IP addresses did not produce useful leads in terms of who had viewed C.M.'s website was based on what the prosecutor had told him; neither he nor, to his knowledge, any other detective took any steps to verify the information provided by the prosecutor.

Following Sergeant Batton's voir dire, the trial court observed that it was "clear" that when the sergeant testified, "he had no firsthand knowledge about these IP addresses [or] any steps that MPD took to try to follow[ ] up on the IP addresses to determine whether or not they resulted in any leads." Rather, "all of that information was furnished to him" by the prosecutor "during their meeting the evening before he took the witness stand." It was thus "clear" that "everything he testified to . . . was based upon hearsay." The jury, the court observed, "was left with the impression[ ] that members of the Metropolitan Police Department actively

sought out these IP addresses" and "followed up on those IP addresses and they led nowhere."

The court noted that whether the prosecutor had behaved "inappropriately" was a separate issue from providing a fair trial to Mr. Toure. To that end, the court posed to the defense the option of striking the relevant portion of Sergeant Batton's testimony and instructing the jury that "MPD did not request these IP addresses and did not track down any leads." The defense countered with a request for a mistrial and dismissal with prejudice, or in the alternative an instruction telling the jury that Sergeant Batton lacked personal knowledge; his information came from the prosecutor; the prosecutor elicited the testimony as if the sergeant knew the information personally; this was misconduct; the government's purposeful elicitation of inadmissible testimony was relevant to the guilt determination; the government's intentional misconduct showed that the government felt its case was weak; and there was no evidence of any investigation into the IP addresses. The government opposed such an instruction and asserted that a curative instruction or striking the testimony would rectify the issue.

The trial court reiterated that the line of questioning "left the jury with the impression that not only did MPD access the web site to see the photo but that MPD actively took steps to follow[ ] up on IP addresses with individuals who had visited

that web site," and that this "really cut directly at what the defense's theory in this case" was—namely, that "the police conducted a shoddy investigation."  "The impression that was certainly left with the jury," the court added, "was that it wasn't just a grand jury subpoena for records but that detectives were actively investigating these leads."

The defense asserted that testimony by the prosecutor was necessary to explore the purpose of the investigation of the IP addresses and specifically whether it was in fact to determine whether there was a link between Mr. Toure and a separate, similar sexual assault that occurred on March 3, 2017, rather than to determine whether C.M.'s assailant could have been someone other than Mr. Toure. The trial court responded that precluding the government from presenting any evidence about any investigation into the IP addresses would "squarely address[ ] any prejudice that the defense may have suffered."

The defense then cross-examined Sergeant Batton, eliciting from him that he saw C.M.'s art photograph on the day her body was discovered but did not personally conduct any investigation regarding her website; he was not aware of any other detective having conducted any investigation regarding the website; he first learned about the IP addresses the night before his direct testimony from the prosecutor; and

he had testified about the absence of any leads from the IP addresses based solely on what the prosecutor had told him. The trial court then instructed the jury as follows:

> Ladies and gentlemen, yesterday the Government elicited testimony from Sergeant Batton about investigating IP addresses related to [C.M.'s] web site.
>
> You have just heard evidence that, in fact, Sergeant Batton did not have personal knowledge of any investigation into IP addresses for [C.M.'s] web site.
>
> Instead the Government told this information to Sergeant Batton during a meeting the night before Sergeant Batton testified. The Government then elicited this information during Sergeant Batton's direct examination as if Sergeant Batton knew the information about the IP addresses personally.
>
> A witness may only testify to information that is within his or her personal knowledge. A lawyer cannot tell information to a witness and then elicit that information from the witness as if it came from the witness'[s] own personal knowledge.
>
> You may consider this evidence, along with all of the other evidence in the case, and give it as much weight as in your judgment it deserves in determining whether the Government has proven the charges in this case beyond a reasonable doubt.

The trial court then denied the government's request to ask Sergeant Batton on redirect about how the grand jury works, and it precluded the government from eliciting that any investigation into the IP addresses occurred. The court, however, allowed the government to "establish that the IP records were subpoenaed by

admitting the grand jury subpoena into evidence." After the government introduced the grand jury subpoena, the court instructed the jury that "after reviewing the data received from Format, which was the subject of the subpoena, the Government took no further steps to identify the accountholders of the IP addresses." The defense then put on its case and then rested that same day.

The next day, the defense moved to reopen its case to call the prosecutor as a witness. The defense argued that, even after the court's instruction, the jury was left with the impression that "the failure to investigate was not because of shoddy work or laziness, but because the evidence didn't lend itself to feasible additional investigative activity," and this was "unconfronted evidence" because the prosecutor, who possessed the knowledge about the investigation, did not testify. Specifically, the defense asserted that it needed to be able to elicit "what steps, if any, [the prosecutor] took to further address these IP addresses and, importantly, why the [government] decided not to pursue this further," as well as whether the IP investigation was in fact to determine whether Mr. Toure was linked to the March 3 crime. The inability to conduct such an examination, the defense contended, violated Mr. Toure's Sixth Amendment right to confrontation.

The trial court denied the motion to reopen and call the prosecutor. The court stated that the defense's cross-examination of Sergeant Batton along with both of

the court's instructions (during the cross-examination and after the admission of the subpoena) served to "mitigate any prejudice that Mr. Toure otherwise would have suffered." It did not see what "additional relevant evidence [would] be gleaned by placing [the prosecutor] under oath in order to inquire further on the matter." The jury, the court observed, was informed that Sergeant Batton had no personal knowledge of any IP address investigation, that the prosecutor had furnished him with the information, and that that was "not permissible behavior by an attorney."

In closing argument, the defense stated that "the Government knew that th[e] photograph [from C.M.'s art project] [wa]s a reason to doubt, and so they tried to . . . manipulate the evidence so that you would pay it no mind, you wouldn't worry about the investigation into this photograph." The defense added that Sergeant Batton had testified falsely that detectives investigated the photograph, when in fact he had gotten the information from the prosecutor the night before his testimony. The defense argued that "[t]his photograph, this manipulation of the evidence, this lack of investigation into the photograph is reasonable doubt." In rebuttal, the government stated that, while the defense had argued that "detectives didn't do any follow up," the evidence showed that the grand jury had subpoenaed Format.com for all IP addresses that had accessed C.M.'s website.

## 2.    Standard of Review

"This court reviews *de novo* whether the admission of certain evidence violates a defendant's constitutional rights under the Confrontation Clause." *Austin v. United States*, 315 A.3d 580, 592 (D.C. 2024) (quoting *Carrington v. District of Columbia*, 77 A.3d 999, 1003 (D.C. 2013)).  "We review the trial court's factual findings for clear error." *Id.* (citing *Freeman v. United States*, 273 A.3d 879, 883 (D.C. 2022)).  Whether constitutional error is harmless is a question of law.  *Davis v. United States*, 564 A.2d 31, 39-42 (D.C. 1989); *see Dowtin v. United States*, 999 A.2d 903, 908 n.3 (D.C. 2010) ("We review de novo the issue of harmlessness.").

## 3.    Discussion

Having observed that it was "clear" that "everything [Sergeant Batton] testified to . . . was based upon hearsay," that the impression left with the jury "was that it wasn't just a grand jury subpoena for records but that detectives were actively investigating these leads," and that "[a] lawyer cannot tell information to a witness and then elicit that information from the witness as if it came from the witness'[s] own personal knowledge," the trial court appears to have proceeded on the premise that the elicitation of the testimony violated Mr. Toure's confrontation and due process rights.  *See Austin*, 315 A.3d at 593 (the Confrontation Clause bars the admission of testimonial out-of-court statements; a statement is testimonial if "the

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006))); *Askew v. United States*, 229 A.3d 1230, 1240 (D.C. 2020) ("It is a bedrock principle of due process in a criminal trial . . . that the government may neither adduce or use false testimony nor allow testimony known to be false to stand uncorrected." (internal quotation marks omitted; ellipses in original)). We make explicit what the trial court assumed: The government's elicitation of what was essentially the prosecutor's own testimonial out-of-court statement in preparing Sergeant Batton for trial was a violation of Mr. Toure's Sixth Amendment right to confront the real witness against him—the prosecutor. As the Supreme Court has made clear, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). In addition, the prosecutor's questioning of Sergeant Batton amounted to the presentation of coached testimony that the prosecutor sponsored to the jury knowing Sergeant Batton would testify falsely as to what he knew about the investigation into the IP addresses. This was a clear violation of due process. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The next question, then, is whether the trial court's remedy for those violations was appropriate. The trial court offered to strike the relevant portion of Sergeant

Batton's testimony and instruct the jury that "MPD did not request these IP addresses and did not track down any leads." When Mr. Toure declined that offer, the trial court instructed the jury in a manner that closely tracked Mr. Toure's requested instruction, including telling the jury that "[a] lawyer cannot" do what the prosecutor did. Mr. Toure, however, sought to call the prosecutor as a witness, which the court denied. Mr. Toure's sole argument on appeal appears to be that this denial was reversible error because it failed to cure the constitutional errors; he does not challenge the trial court's denial of his request for a mistrial and dismissal of the indictment with prejudice.

Although allowing the defense to call and cross-examine the out-of-court declarant might be the most straightforward and preferred way to redress a Confrontation Clause violation, Mr. Toure points to no authority suggesting that it is the only, or a necessary, cure. We find it unnecessary, however, to decide whether the trial court erred in denying Mr. Toure's request to reopen his case and examine the prosecutor. That is because, even assuming error, it was harmless under the standard for constitutional error first set forth in *Chapman v. California*, 386 U.S. 18 (1967). "A constitutional error is considered harmless if the government can show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *G.W. v. United States*, 323 A.3d 425, 438 (D.C. 2024) (internal quotation marks omitted). "We have found constitutional error harmless

where the government presented overwhelming evidence of guilt or it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Gardner v. United States*, 999 A.2d 55, 58 (D.C. 2010) (internal quotation marks omitted).[3]

First, the cross-examination of Sergeant Batton plus the instructions provided by the trial court substantially mitigated any prejudice. The cross-examination and instructions conveyed that (1) Sergeant Batton did not have personal knowledge of any investigation into the IP addresses; (2) the government told this information to Sergeant Batton the night before Sergeant Batton testified; (3) the government then elicited this information during the sergeant's direct examination as if the sergeant knew the information personally; (4) a witness may only testify to information that is within his or her personal knowledge; (5) a lawyer cannot tell information to a

---

[3] A Confrontation Clause violation is subject to review for harmlessness beyond a reasonable doubt. *See Austin*, 315 A.3d at 602. In *United States v. Nelson*, 217 A.3d 717, 722 (D.C. 2019), we stated that a violation of *Napue*, 360 U.S. 264, which bars the government from knowingly producing or allowing to go uncorrected false or misleading evidence, requires the defendant to show both the violation and "a 'reasonable likelihood' that the false or misleading testimony could have affected the jury's verdict." *Nelson*, 217 A.3d at 722 (quoting *Hawthorne v. United States*, 504 A.2d 580, 589-90 (D.C. 1986)). We then observed that "there is little difference between requiring a defendant to show 'a reasonable possibility that the evidence complained of might have contributed to the conviction,' and requiring the government to show harmlessness beyond a reasonable doubt." *Id.* at 723. Mr. Toure agrees that his convictions can be affirmed if the error was harmless beyond a reasonable doubt.

witness and then elicit that information from the witness as if it came from the witness's own personal knowledge; (6) the jury could consider this evidence in determining whether the government had proven the charges in this case beyond a reasonable doubt; and (7) after reviewing the IP address information in response to the subpoena, the government took no further steps to identify the accountholders of the IP addresses. We find it highly unlikely that, after hearing all of this, the jury would have maintained the impression that detectives—or anyone on the prosecution team, for that matter—conducted any meaningful investigation into the IP addresses. The jury would, moreover, have understood that the prosecutor behaved improperly and that it could consider that fact in its deliberations.

Second, if Mr. Toure had been able to question the prosecutor, we fail to see much benefit to his defense case even if the prosecutor had answered all questions in the manner that Mr. Toure would have wanted. The trial court had already conveyed to the jury, among other things, that "the Government took no further steps to identify the accountholders of the IP addresses" and that the prosecutor's conduct in eliciting testimony that was not only provided to the witness but also incorrect was inappropriate. The prosecutor at best (for Mr. Toure) would merely have confirmed these points, and, to Mr. Toure's detriment, could possibly have undermined them by describing any steps the grand jury or the prosecution team took to investigate the IP addresses. Mr. Toure also wanted to elicit whether the IP

investigation was in fact to determine whether Mr. Toure was linked to the March 3 crime, but, even if the prosecutor answered that question in the affirmative, we do not see how the impetus behind the investigation would have added anything to the jury's analysis, when Mr. Toure's ultimate point was that the government failed to conduct any meaningful investigation into the IP addresses in connection with the murder of C.M.

At oral argument, counsel for Mr. Toure suggested that in assessing harm in these circumstances, we must assume that the witness would have provided the most favorable (for the defendant) testimony imaginable. Counsel posited that here, the prosecutor might have revealed that he thought the evidence against Mr. Toure was so weak that he had to engage in misconduct; and counsel answered in the affirmative when asked at argument if we must go so far as to assume that the prosecutor would have admitted on the stand that the IP address investigation pointed to another suspect and the government ignored that evidence because it wanted to pin guilt on Mr. Toure. But harmlessness is based on reasonable probabilities, and we doubt that we are required to assume farfetched "Matlock moments" in determining whether a confrontation violation was harmless. In the context of this case, we think it highly unlikely that the prosecutor would have provided bombshell testimony that would have led the jury to find reasonable doubt about Mr. Toure's guilt.

Third, while we fail to see how, on the facts of this case, testimony by the prosecutor would have moved the needle even on its own terms, it becomes evident that any error in precluding examination of the prosecutor was harmless beyond a reasonable doubt when that potential testimony is considered in light of the overwhelming evidence against Mr. Toure. *See Austin*, 315 A.3d at 603 (overwhelming evidence supports a conclusion beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained); *Nelson*, 217 A.3d at 723 (for a *Napue* violation, "[w]e have held that a factor that may also weigh in favor of finding harmless error is when the evidence against the defendant is so overwhelming, and consists of strong independent, circumstantial evidence, and other evidence to sufficiently mitigate any negative effect of the tainted evidence" (internal quotation marks omitted)); *Tann v. United States*, 127 A.3d 400, 460 n.51 (D.C. 2015) (per curiam) ("[W]e have found error harmless beyond a reasonable doubt where the government's evidence was otherwise 'overwhelming[.]'").

For the reasons set forth above in connection with Mr. Toure's *Brady* claim, in this harmlessness analysis we again disregard the DNA evidence arising out of testing by DFS, but we still have little difficulty concluding that the jury would have found Mr. Toure guilty beyond a reasonable doubt even if the prosecutor had testified. As discussed above, the leggings used to bind C.M. were tested by Signature Science, not DFS, and Mr. Toure was the major contributor to DNA found

in semen on the leggings. In addition, among other things, video evidence showed Mr. Toure approaching C.M. shortly before she was raped and murdered and thereafter repeatedly using her credit and debit cards, with apparent knowledge of her PIN; suddenly after the rape and murder, Mr. Toure had cash, allowing him to stay in a hotel rather than shelters and buy a car; and C.M.'s wounds were consistent with wounds that could be caused by the knife found in Mr. Toure's car. Between the leggings DNA evidence, the video of Mr. Toure approaching C.M. just before the crimes, and the videos of Mr. Toure using C.M.'s credit and debit cards with correct PINs, the case against Mr. Toure was, in a word, powerful.

Mr. Toure suggests that reversal is called for based on the government's misconduct in and of itself. "We do not," however, "reverse convictions in order to punish prosecutors, but to remedy prejudice resulting from the trial court's error." *Shelton v. United States*, 26 A.3d 216, 222 (D.C. 2011) (per curiam) (internal citation omitted).[4] He also argues that in our harmlessness analysis we must consider the

---

[4] Prosecutorial misconduct, even if it does not result in reversal of a conviction, is properly addressed through investigation and sanction for violations of rules of professional conduct, as appropriate. The prosecutor's actions in coaching Sargeant Batton in preparation for trial and then eliciting a false statement under oath are deeply troubling to the court and bear further inquiry. This misconduct must be viewed in the larger context of previous failures to turn over exculpatory information, including the nondisclosure of a potential alibi in connection with the separate March 3 rape for which the government had investigated Mr. Toure, resulting in a sanction by the trial court. *See* D.C. R. Pro. Conduct 3.8(d) (Special Responsibilities of a Prosecutor).

fact that the government apparently (based on the prosecutor's misconduct) doubted the strength of its case. He cites *Gardner*, but when we said there that "[a prosecutor's] own estimate of his case, and of its reception by the jury at the time, is . . . a highly relevant measure . . . of the likelihood of prejudice," 999 A.2d at 62-63 (internal quotation marks omitted; alterations in original), we were recognizing that the government's heavy reliance on certain evidence at trial supports a conclusion that error in admitting that evidence was not harmless, *see id.* at 63.[5] In any event, even to the extent a prosecutor's subjective view of the strength of a case is pertinent to the harmlessness inquiry,[6] we do not see the prosecutor's improper efforts to elicit testimony about the IP addresses here as so indicative of a

---

[5] Mr. Toure also cites the concurring opinion in *Shelton*, 26 A.3d at 224-29 (Ruiz, J., concurring in the disposition), but the issue in *Shelton* was whether prosecutorial misconduct, and any inference therefrom about the government's view of the strength of its case, is relevant evidence for a *jury* to consider in assessing guilt or innocence. *See id.* at 222; *see also id.* at 224-29 (Ruiz, J., concurring in the disposition). Here, the court told the jury that a lawyer "cannot" do what the prosecutor did and that the jury could "consider this evidence" "in determining whether the Government has proven the charges in this case beyond a reasonable doubt." Mr. Toure then argued in closing that the government "tried to . . . manipulate the evidence" because it knew there was "a reason to doubt."

[6] *See United States v. Boyd*, 55 F.3d 239, 241-42 (7th Cir. 1995) ("The gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted. If the prosecutors did not think their case airtight (and so they tried to bolster it improperly), this is some indication that it was indeed not airtight." (citations omitted)).

weakness in the case against Mr. Toure as to overcome the overwhelming evidence against him.

### III.    Conclusion

For the foregoing reasons, we affirm Mr. Toure's convictions, affirm the trial court's denial of Mr. Toure's motion for a new trial, and remand for the limited purpose of merging convictions and resentencing as necessary.

*So ordered.*